UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JONATHAN LEE GENTRY,

    Petitioner,

      v.

RICHARD MORGAN,

      Respondent.

Case No.  C99-0289L

ORDER ON PETITION FOR HABEAS
RELIEF BASED ON BRADY AND
NAPUE VIOLATIONS

## I.  INTRODUCTION

    This matter comes before the Court on Jonathan Lee Gentry's ("petitioner" or "Gentry")

petition for a writ of habeas corpus.  See Dkt. #47 (First Amended Petition for Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254).  Beginning on March 6, 2006, this Court held an

evidentiary hearing on petitioner's Brady and Napue claims as to state witnesses Timothy Hicks,

Brian Dyste, and Detectives Doug Wright and Smed Wagner.[1]  The Court also heard testimony

about whether a pattern of misconduct established cause for petitioner's procedural default of

his Brady claim regarding Leonard Smith.[2]  The parties submitted post-hearing briefs in support

---

    [1]  See Dkt. #148 (Respondent's Memorandum Regarding Evidentiary Hearing, Discovery and
Timelines) at 2 ("Mr. Gentry is entitled to an evidentiary hearing as to his Brady/Napue claims as to Brian
Dyste and Timothy Hicks.").

    [2]  See Dkt. #156 (Order Regarding Discovery and Evidentiary Hearing) at 4 (framing the issues
for the hearing: "(a) Did a pattern of Brady and Napue misconduct before and during the underlying

of their respective arguments.[3]  See Dkt. #258; #267.  This Order discusses petitioner's Brady and Napue claims with respect to Timothy Hicks, Brian Dyste, and Detectives Doug Wright and Smed Wagner.[4]

## II.  FACTUAL BACKGROUND

### A.    Gentry's Conviction and Sentence

In 1991, Gentry was convicted of aggravated first degree murder and sentenced to death. The body of Cassie Holden, the twelve-year-old victim, was found partially undressed in a wooded area near a golf course in a rural part of Kitsap County.  Eyewitnesses described seeing an African-American man around the area at the time of the crime.  Nobody disputes that the African-American population in this area was so small that the presence of an African-American man in this location was an unusual circumstance.  This tip led the police to suspect Gentry, who was out on bail awaiting a felony rape trial and living in his brother's nearby home.  The police searched the house and found clothing matching eyewitness descriptions, and shoes with blood on the shoelaces.  During the investigation of the Cassie Holden murder, Gentry was tried and convicted of the felony rape charge and sentenced to 20 years in prison.  He was then sent to the Shelton Corrections Center, where he was housed with Hicks and Smith.  Gentry was housed with Dyste in the Kitsap County Jail in August of 1988.

Gentry was convicted primarily based on the following evidence:  (1) the testimony of

proceedings establish cause for Petitioner's default of the [Leonard] Smith Brady/Napue claims?" and "(b) Did the State violate Brady and Napue by failing to disclose evidence relating to Timothy Hicks, Brian Dyste, Detective Wright, or Detective Wagner?").

   [3]  On the first page of his post-hearing brief, Gentry requests oral argument.  See Dkt. #258 (Petitioner's Post-Evidentiary Hearing Brief).  In light of the four-day evidentiary hearing in this matter, which included post-hearing oral argument, the Court denies Gentry's request for additional post-hearing argument.  See Dkt. #256 (March 9, 2006 Transcript of Proceedings).

   [4]  In a subsequent order, the Court will address whether Gentry established cause and prejudice for his default of the Leonard Smith Brady/Napue claims.

ORDER ON PETITION FOR
HABEAS RELIEF BASED ON
BRADY AND NAPUE VIOLATIONS - 2

eyewitnesses describing a man similar in appearance in the area around the time of the murder; (2) a DNA analysis that determined that a hair at the scene of the crime matched that of Gentry's brother, who was aboard a naval vessel at sea at the time of the crime;[5] (3) a DNA analysis that determined that the blood on the shoe at Gentry's residence matched that of Cassie Holden; and (4) testimony from Dyste, Hicks and Smith that Gentry told them that he murdered Cassie and referred to her as a "bitch."

During the penalty phase, the victim's father, Frank Holden, spoke about his daughter and the effect her death had on him. The jury also heard about Gentry's extensive and violent criminal history, which included convictions for two burglaries, manslaughter, and rape with a deadly weapon, which was committed only months before Cassie's murder. In the prosecutor's closing argument, he focused on Frank Holden's testimony, Gentry's criminal history, and the brutal act of violence that ended Cassie Holden's young life.

## B.    Brian Dyste

Although the Kitsap County deputy prosecuting attorneys in charge of the Gentry case, Brian Moran and Irene Asai, stipulated that the State had no relationship with any of its witnesses, and Dyste testified at trial that he was not given anything in exchange for his testimony, Dyste had in fact acted as a paid informant for Kitsap County between the time he allegedly heard Gentry's confession and the time that he testified against him. During his time as a paid informant, Dyste worked with Detectives Rodney Pfitzer and also Doug Wright, who was the lead detective in the Gentry investigation. He is known to have received monetary benefits in return for his assistance on these drug cases, and also was released from jail on a 60-day sentence after serving only 24 days.

This Court's evidentiary hearing examined the Kitsap County deputy prosecutors'

---

[5]  The same analysis excluded Gentry as the source of the hair. The theory behind the probity of this evidence was that Gentry wore his brother's clothes, and therefore was responsible for the hair's transport to the scene of the crime.

awareness of Dyste's history of cooperating with the authorities in exchange for money or relief from sentences. Pre-hearing discovery showed that DPA Moran twice made reference in his notes to Dyste's relationship with Kitsap County authorities: First, he wrote "[Pfitzer] and Dyste are buddies * use him on 1 count: Dyste will be paid *[.]" EH Ex. 219. Second, Moran indicated his own suspicion of Dyste's status when he wrote "Professional informant?" Id. Nonetheless, he never conveyed this information to defense counsel despite their requests for information about the witnesses' relationship with the county. Finally, petitioner also notes that DPA Moran's notes from his initial interview with Dyste do not mention that Dyste said that Gentry had called his victim a "bitch." No evidence was presented at the evidentiary hearing that Dyste received any compensation or benefits based on his testimony against Gentry. See infra note 9.

## C. Timothy Hicks

At trial, Timothy Hicks adamantly declared that he received nothing in exchange for his testimony:

> DPA Moran: Did you ask [Washington Department of Corrections Lieutenant Alwine] for any special favors or promises for money, or cigarettes, or laundry facilities, or anything of that nature?
>
> Hicks: Nothing.
>
> DPA Moran: Did you receive anything for your testimony today?
>
> Hicks: Nothing.
>
> DPA Moran: Do you expect anything for your testimony today?
>
> Hicks: I won't accept anything. I don't expect anything.

16 REC 8760. On re-direct, DPA Moran took the opportunity to emphasize the point to rehabilitate Hicks after a lengthy and effective cross-examination:

> DPA Moran: Do you expect any benefit from the Kitsap County Prosecutor's Office or the State of Washington for your testimony here today?
>
> Hicks: I expect none, nor will I accept any.

16 REC 8800-8801.  In fact, only two months before his testimony, Hicks wrote a letter to DPA

Moran which said:

> I still have "great" concern over my parole status. . . .  Could you "please" contact
> Mr. Carlson at the Parole Board and obtain the official position of the board.  Will
> I have to see them before I get out in March 1993.  If I do, I have tremendous
> reservations testifying in the Gentry case.  I "need" to know where I stand before I
> go to court.  I can't go to court, and say what is true and correct, with the
> possibility of spending 3 or 4 years "inside" a major institution. . . .  This is all I
> ask for my appearance in court.

EH Ex. 113.  Thus, Hicks's denials appear at least facially inconsistent with his prior letter.  In

that letter he did later reiterate his desire to testify:  "I am not backing out on my position on the

Gentry case.  My values and commitment are steadfast."  Id.

Hicks's concern arose from an administrative error that resulted in his having his parole

indefinitely revoked for crimes committed before Washington's Sentencing Reform Act ("SRA")

while he served time for post-SRA crimes.  When he was imprisoned after the SRA, his parole

should have been reinstated, allowing his pre- and post-SRA sentences to run concurrently.

Hicks feared that if his parole status was not clarified, he would be re-imprisoned for his pre-

SRA crimes after his release for his post-SRA crimes, and he would end up serving consecutive

sentences.  Shortly after receiving the letter, DPA Moran called the Indeterminate Sentence

Review Board and the Board quickly resolved the administrative error.  Moran never mentioned

this assistance that he provided—nor Hicks's insistence on it—to defense counsel.

There also exists some circumstantial evidence of an unrecorded agreement for some

state-sponsored benefit in return for Hicks's testimony.  First, shortly after he was approached

by Detective Doug Wright during the course of Wright's investigation of the Gentry murder, he

sought and received a transfer from the Larch Corrections Center to the McNeil Island

Corrections Center, where he could continue to pursue his education.  Although he was never

told so explicitly, Hicks testified that he believed the transfer was in exchange for his agreement

to testify.  Second, during plea negotiations for another crime in 1994, Hicks argued for a lower

sentence based on his cooperation in the Gentry action. The Pierce County deputy prosecutor, Chris Conant, contacted Moran and made the following notation: "[Moran] stated that as far as he is concerned [Hicks] got his break already at the time he testified in the Kitsap County case and that he does not warrant further consideration in this regard." EH Ex. 110. At the evidentiary hearing, Moran stated that he believed that Conant mischaracterized their exchange.

## III. DISCUSSION

### A. 18 U.S.C. § 2254 and the Washington Supreme Court's Ruling on Gentry's Personal Restraint Petition

#### 1. Standard for Review

Gentry filed his federal habeas petition in 1999, therefore 18 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, applies to his case. Williams v. Taylor, 529 U.S. 362, 402 (2000). The AEDPA "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." Id. at 399 (O'Connor, J., concurring). "AEDPA's purpose [is] to further the principles of comity, finality, and federalism." Williams v. Taylor, 529 U.S. 420, 436 (2000) ("Williams II"). "Federal habeas corpus principles must inform and shape the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts. In keeping this delicate balance [the Supreme Court has] been careful to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings." Id.

Under the AEDPA, this Court will not grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see Early v. Packer, 537 U.S. 3, 8 (2002) (per curium). "[C]learly

established Federal law, as determined by the Supreme Court of the United States" refers to the Supreme Court's holdings at the time of the relevant state-court decision. <u>Williams</u>, 529 U.S. at 412.

Section 2254(d)'s "contrary to" and "unreasonable application of" clauses have independent meaning. <u>Williams</u>, 529 U.S. at 404-05. A state court decision is "contrary to" clearly established federal law where the "state court arrives at a conclusion opposite to that reached by the [Supreme Court] on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" the Supreme Court's decision. <u>Id.</u> at 405. "A state court decision constitutes an unreasonable application of Supreme Court precedent only if the state court decision is objectively unreasonable. That is, the state court decision must be 'more than incorrect or erroneous.'" <u>Stenson v. Lambert</u>, 504 F.3d 873, 881 (9th Cir. 2007) (quoting <u>Cooks v. Newland</u>, 395 F.3d 1077, 1080 (9th Cir. 2005)). At bottom, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." <u>Schriro v. Landrigan</u>, 127 S. Ct. 1933, 1939 (2007). In light of these standards, Gentry "is not entitled to habeas relief under 28 U.S.C. § 2254(d)(1) unless the Washington court's decision 'was contrary to or involved an unreasonable application of the [Supreme Court's] applicable holdings.'" <u>Stenson</u>, 504 F.3d at 881 (alteration in original) (quoting <u>Carey v. Musladin</u>, 127 S. Ct. 649, 653 (2006)).

The Court may also grant relief under 28 U.S.C. § 2254(d)(2) if the state court adjudication "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Id.</u> The AEDPA, however, "requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" <u>Schriro</u>, 127 S. Ct. at 1939-40; (quoting 28 U.S.C. § 2254(e)(1)); <u>see</u> <u>Stenson</u>, 504 F.3d at 881 (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) (holding the court "may not overturn them 'absent clear and convincing evidence'

that they are 'objectively unreasonable.'").

**2.  Gentry's Personal Restraint Petition**

Before the Court applies the AEDPA's standards, the Court must identify the appropriate state court decision for review.  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002) ("In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision[.]").  Following his jury trial, the Washington Supreme Court affirmed Gentry's conviction and death sentence on direct appeal in State v. Gentry, 125 Wn.2d 570 (1995).  The United States Supreme Court denied Gentry's petition for writ of certiorari in Gentry v. Washington, 516 U.S. 843 (1995).  Gentry then sought post-conviction relief and filed a personal restraint petition ("PRP"), Washington's mechanism for collateral challenges, with the Washington Supreme Court, as reported in In the Matter of the Personal Restraint Petition of Jonathan Lee Gentry, 137 Wn.2d 378, 400 (1999) ("In re Gentry").

The Court concludes that Washington Supreme Court's denial of Gentry's PRP in In re Gentry is the state court decision appropriate for review here because it is the last reasoned decision adjudicating Gentry's Brady and Napue claims on the merits.  See Barker, 423 F.3d at 1092 ("28 U.S.C. § 2254(d) applies only to those claims that have been adjudicated on the merits."); 1093 ("The Court's analysis of the state court proceedings in Williams confirms our conclusion that the AEDPA generally requires federal courts to review one state decision.").

In In re Gentry, the Washington Supreme Court concluded that there was no Brady violation:

> In conclusion, some of the evidence Gentry has provided could readily have been discovered by trial counsel or was not known to the State.  Some of the evidence could have been used to impeach one or more of the informants, but in the light of all the circumstances, we cannot say the unavailability of this minimal additional impeachment "actually and substantially prejudiced" Gentry.

In re Gentry, 137 Wn.2d at 400 (citation omitted).  As discussed below, the Washington Supreme Court's ruling that some of the evidence was "Brady material" because it could have

been used to impeach one or more of the informants, but that ultimately there was no "Brady violation" because the evidence was not material, is not contrary to, or an unreasonable application of, clearly established law.[6]

Before turning to this discussion, however, the Court notes that in Barker v. Fleming, the Ninth Circuit in *dicta* "observe[d] that the interplay of the Washington PRP 'actual and substantial prejudice' standard and the Brady materiality standard is not without confusion." Barker, 423 F.3d at 1094. The Court went on to state that:

> It is unclear whether the PRP standard, as used here, governs a threshold examination that determines whether a petitioner may raise his claim, or whether it is the ultimate showing required for relief. The difference matters for federal habeas review because if the standard is a threshold obstacle to state court review, it would not conflict with the Brady materiality standard. In that event, the petitioner simply would fail to gain access to Washington's post-conviction review. If it is a substantive standard imposed in addition to the prejudice showing required under Brady and its progeny, it appears to impose a higher burden than is required to establish prejudice under Brady.

Id. at 1094-95 (internal citations omitted).

This Court construes the Washington Supreme Court's application of the "actual and substantial prejudice standard" to Gentry's PRP as a threshold obstacle that does not conflict with Brady's materiality standard. And, even if the application of "actual and substantial prejudice" is construed as a substantive standard, in In re Gentry the Washington Supreme Court

---

[6] Throughout this Order, the Court uses the term "Brady material" and "Brady violation" consistent with the Supreme Court's clarification of these terms in Strickler v. Greene, 527 U.S. 263, 281-82 (1999):

> Thus the term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "Brady material"—although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

ORDER ON PETITION FOR
HABEAS RELIEF BASED ON
BRADY AND NAPUE VIOLATIONS - 9

did not impose a higher burden than required under <u>Brady</u> to establish prejudice because the Court correctly applied the <u>Brady</u> materiality standard in its review of Gentry's PRP, stating "evidence is 'material' and therefore must be disclosed under <u>Brady</u> 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>In re Gentry</u>, 137 Wn.2d at 396 (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)) (internal quotation marks omitted).[7]

Having determined that there is no conflict between the PRP and <u>Brady</u> standard in <u>In re Gentry</u>, the Court now turns to the issue of whether the Washington Supreme Court's rulings were contrary to or involved an unreasonable application of the Supreme Court's applicable holdings.

**B.      Brian Dyste**

**1.      <u>Brady</u> Claims**

"Supreme Court holdings at the time of the state court's last reasoned decision are the source of clearly established Federal law for purposes of AEDPA." <u>Barker</u>, 423 F.3d at 1093 (9th Cir. 2005) (citing <u>Williams</u>, 529 U.S. at 412).  At the time the Washington Supreme Court denied Gentry's PRP, "the components of a <u>Brady</u> claim were clearly established by Supreme Court law—a defendant must show that 1) the prosecution suppressed evidence that 2) was favorable to the accused and 3) was material." <u>Id.</u> (citing <u>Strickler</u>, 527 U.S. at 281–82); <u>see also</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

The impeachment value of Dyste's relationship with the lead detective in the Gentry trial

---

[7]  In <u>Barker</u>, the Ninth Circuit in a footnote acknowledged that "[i]n practice, Washington courts often avoid the potential conflict between the 'actual and substantial prejudice' standard, which applies in all PRPs raising constitutional claims for the first time, and other federal standards that incorporate prejudice . . . [by] equat[ing] the 'actual and substantial prejudice' standard with the prejudice showing incorporated in the federal test." <u>Brady</u>, 423 F.3d at 1095 n.5.  Here, there is no practical conflict between the "actual and substantial prejudice" standard and <u>Brady</u> given the Washington Supreme Court's application of the correct federal prejudice standard.

is the only fact that petitioner sets forth that triggers the <u>Brady</u> analysis. <u>See</u> Dkt. #258 (Petitioner's Post-Evidentiary Hearing Brief) at 20; Dkt. #47 (Amended Petition) at 36; <u>Bagley</u>, 473 U.S. at 676 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the <u>Brady</u> rule."). Evidence undermining the credibility of a state's witness is "'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." <u>Id</u>. (quoting <u>Brady</u>, 373 U.S. at 87) (internal citation omitted).

The section of the <u>In re Gentry</u> opinion addressing Dyste's status as a regular informant in other Kitsap County actions did not address the impeachment value per se, but rather focused on the fact that the documents did not show that Dyste was paid for his testimony in Gentry's trial. The court likely considered the non-Gentry informant relationship to be, at most, "minimal additional impeachment" that was not prejudicial. <u>In re Gentry</u>, 137 Wn.2d at 400.

Dyste's ongoing relationship with Kitsap County detectives and prosecutors during the time of the Gentry investigation where he received benefits from the lead investigator for the Gentry investigation plainly has impeachment value. <u>See</u> <u>United States v. Shaffer</u>, 789 F.2d 682, 688–89 (9th Cir. 1986) (finding <u>Brady</u> error where state failed to disclose that witness was "a paid informant in a separate heroin operation" and the nature of his compensation for that work). Dyste's willingness to work and testify for the government in exchange for money and other benefits before suggests to the jury that even if he has not received an explicit promise, he might harbor hopes that persuasive testimony might allow him to maintain his favorable relationship with Detective Wright. <u>See</u> <u>Boone v. Paderick</u>, 541 F.2d 447, 451 (4th Cir. 1976) ("[R]ather than weakening the significance for credibility purposes of an agreement of favorable treatment, tentativeness may increase its relevancy. This is because a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced—the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor."). Defense counsel could have used this

1   information to impeach Dyste's credibility.

2          DPA Moran says he was unaware of Dyste's relationship with his lead detective. This is

3   largely irrelevant, however, because under Ninth Circuit case law, an investigator's knowledge

4   of exculpatory information is attributable to the prosecutor. Cf. United States v. Zuno-Arce, 44

5   F.3d 1420, 1427 (9th Cir. 1995) ("[T]he prosecutor is deemed to have knowledge of and access

6   to anything in the custody or control of any federal agency participating in the same

7   investigation of the defendant.") (quotation marks omitted). Moreover, it is unnecessary to test

8   the extremes of this principle of presumptive knowledge in the instant case, because it became

9   clear during discovery in preparation for the evidentiary hearing that DPA Moran at least

10  suspected Dyste's status, and therefore was obligated to inquire in order to confirm or dispel the

11  suspicion. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a

12  duty to learn of any favorable evidence known to the others acting on the government's behalf in

13  the case, including the police."). Petitioner has presented a set of facts at the evidentiary hearing

14  that make clear that DPAs Moran and Asai[8] either knew or should have known that Dyste was a

15  paid informant for Kitsap County. To the extent that the Washington Supreme Court determined

16  that this benefit was not "Brady material," it unreasonably applied clearly established Supreme

17  Court precedent. Giglio v. United States, 405 U.S. 150, 153–54 (1972). As the Court discussed

18

19         [8] At the evidentiary hearing on March 8, 2006, DPA Asai testified that her 1995 affidavit
    submitted in the PRP proceedings, where she stated that she had no reason to know whether Dyste
20  served as a confidential informant in any drug investigations, was the most accurate recollection as to
    whether she had knowledge of Dyste's work as an informant. See Dkt. #255 at 130-33. However, less
21  than a month before the evidentiary hearing, in her February 16, 2006 deposition DPA Asai contradicted
    that testimony and said that she believed that Dyste worked as an
22  informant on drug cases. See Dkt. #218 (Asai Dep.) at 45:21-46:13 ("Q. Do you remember Mr. Dyste?
    A. Yes. Q. Are you aware that prior to Mr. Dyste's testimony against Mr. Gentry that he had worked
23  with Kitsap County law enforcement? A. I became aware of the fact that he had worked with Kitsap
    County. Q. When did you become aware of that? A. I don't remember. Q. Prior to trial? A. I believe
24  it was prior trial. Q. What was your – what is your recollection of what sort of work he had done with
    Kitsap County? A. My recollection was it was involved in drug cases. Q. Working with who? A. I
25  believe it was Doug Wright.").
26

27  ORDER ON PETITION FOR
    HABEAS RELIEF BASED ON
28  BRADY AND NAPUE VIOLATIONS - 12

above in Section III.A.2, the Washington Supreme Court in In re Gentry ultimately ruled that this information was not material and therefore not a Brady violation, a decision which the Court reviews in Section III.D below.

Finally, the Court finds that DPA Moran's original notes that do not include reference to the word "bitch" do not constitute Brady material, and therefore the prejudicial value of Moran's failure to hand over these notes will not be considered. Moran's notes from this first conversation with Dyste represent his "impressions of the evidence" and therefore are not included in the Brady disclosure obligation. Morris v. Ylst, 447 F.3d 735, 742 (9th Cir. 2006) ("[I]n general, a prosecutor's opinions and mental impressions of the case are not discoverable under Brady unless they contain underlying exculpatory facts."), cert. denied, 127 S. Ct. 957 (2007) (emphasis in original).

## 2. Napue Claims

"To prevail on a claim based on Mooney-Napue, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false,[9] and (3) that the false testimony was material." United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003) (citing Napue v. Illinois, 360 U.S. 264, 269–71 (1959)); see also Mooney v. Holohan, 294 U.S. 103 (1935). Dyste testified that he was never given anything or promised anything in exchange for the information he gathered from Gentry, or for his testimony against Gentry. Petitioner has failed to provide any evidence to show that this testimony was false, much less refute with clear and convincing evidence the state court's factual finding that Dyste received no benefit in exchange for his testimony. See In re Gentry, 137 Wn.2d at 398 ("There is also no circumstantial evidence the informants benefitted from

---

[9] The Declaration of Scott J. Engelhard that declared a freelance journalist, Jan Mahan, claimed Brian Dyste told her he was paid $7,000 - $10,000 for his testimony in the Gentry case was refuted by the testimony of Ms. Mahan and the Court's in camera review of both her notes and her taped conversations with Dyste, which showed nothing to indicate any money was offered or paid to Dyste in regard to the Gentry prosecution. EH Ex. 585-86 (Englehard Decl.).

their testimony."). Therefore, Gentry's <u>Napue</u> claim as to Dyste is denied.

**C.    Timothy Hicks**

**1.    <u>Brady</u> Claim**

Respondent's insistence that Hicks received no "deal" in exchange for his testimony is a carefully worded argument intended to suggest that Hicks received nothing in exchange for his testimony, a notion that is clearly belied by his April 8, 1991 letter and DPA Moran's response to the request therein. <u>See</u> Dkt. #287 (Respondent's Post-Hearing Brief) at 11-12. In his letter, at one point Hicks hinted strongly that he might not testify unless the status of his parole was sorted out. EH Ex. 113 ("This is all I ask for my appearance in court."). DPA Moran immediately called the parole board and got Hicks's parole sorted out. Hicks testified. The prosecution never mentioned Hicks's parole issue to the defense. The prosecution must disclose benefits received by witnesses in exchange for their testimony. <u>Giglio</u>, 405 U.S. at 153–54.

The distinction that respondent seeks to draw—between favorable treatment and efforts to resolve a bureaucratic mix up—is not one that is recognized by the courts. Not unlike Dyste's paid-informant status, the prosecution could dispute the materiality or impeachment value of this information, but its responsibility to disclose the information is indisputable. The law does not contemplate a de minimis exception to the <u>Brady</u> disclosure requirement (nor would this exchange fall into one). <u>See United States v. Bernal-Obeso</u>, 989 F.2d 331, 334 (9th Cir. 1993) ("[W]e expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by <u>Giglio</u> to turn over to the defense in discovery <u>all</u> material information casting a shadow on a government witness's credibility.") (emphasis in original). Hicks's request for a clarification of his parole status and his threat not to testify unless he received the state's assistance, clearly cast a shadow over Hicks's credibility. It should have been disclosed to defense counsel. To the extent that the Washington Supreme Court determined on this same set of facts that this benefit was not <u>Brady</u> material, it unreasonably applied clearly established Supreme Court precedent. <u>Giglio</u>, 405 U.S.

at 153–54.[10]  This determination is not dispositive, however, because as the Court discussed

above in Section III.A, in In re Gentry the Washington Supreme Court ultimately ruled that this

information was not material and therefore not a Brady violation, a decision which the Court

reviews in Section III.D below.

Finally, petitioner points to Hicks's request for additional consideration in 1994, and

DPA Moran's alleged insistence that Hicks "got his break already at the time he testified."  EH

Ex. 110.  This note from more than three years after the trial is clearly not "Brady material" that

should have been disclosed.[11]  Similarly, the Court finds that Hicks's transfer from Larch

Corrections Center to McNeil Island Corrections Center is not Brady material.  The timing of

the transfer is the only evidence that there was a link between that benefit and his agreement to

---

[10]  The Court addressed DPA Moran's efforts on behalf of Hicks specifically, concluding that:

> Although [the parole board's] ruling benefitted Hicks, the Board did not
> reverse any prior decision, but simply acted on a long-pending parole
> matter. The benefit to Hicks from the Board's finally taking action was not
> a quid pro quo for his testimony in Gentry's case. The prosecutor neither
> asked the Board to grant Hicks leniency, nor did the Board base its
> decision on  Hicks' role in Gentry's case. According to the Board itself, it
> reinstated his parole for several other, unrelated reasons including its failure
> to hold a timely parole revocation hearing.

In re Gentry, 137 Wn.2d at 398–99.  Although the Washington Supreme Court did not expressly
conclude that the exchange was not Brady material because Hicks received no special treatment from the
parole board, this conclusion is implied by the language quoted above.  Alternatively, it is possible that
the court concluded that this was "Brady material" but, again, was not prejudicial, or merely cumulative.

[11]  It is not clear whether petitioner believes that this notation is relevant because it confirms that
DPA Moran did believe that he provided Hicks with a benefit by calling the parole board, or that it is
evidence of a further benefit received by Hicks.  To the extent it is the former, as set forth above, the
Court agrees DPA Moran knew or should have known that his favor to Hicks should have been disclosed
under Brady.  If it is the latter, then it is unavailing because it does not clearly and convincingly show that
the state court was incorrect in finding that Hicks received no other benefit in return for his testimony.
See In re Gentry, 137 Wn.2d at 398 ("There is also no circumstantial evidence the informants benefitted
from their testimony.").

testify.  The Washington Supreme Court concluded that it was not a benefit in exchange for his

testimony and petitioner has not provided clear and convincing evidence to rebut that finding.

See In re Gentry, 137 Wn.2d at 399 ("[T]he record indicates Hicks was transferred so he could

complete his college degree at a nearby school, not because of his testimony against Gentry.").

Accordingly, the Court denies petitioner's Brady claims regarding the 1994 notation and the

transfer to McNeil Island.

### 2.    Napue Claim

Respondent's explanation for the exchanges in which DPA Moran twice elicited

testimony from Hicks that he "neither expected nor would accept" any benefit from his

testimony is that DPA Moran and respondent do not view DPA Moran's request to the parole

board to be a thing of value.  Respondent's position on this issue is consistent with its argument

that Hicks's letter requesting assistance is not "Brady material"—that the exchange was not a

benefit.  First, as concluded above, Hicks did receive a benefit.  More important, however, was

Hicks's obvious threat to refuse to testify if DPA Moran failed to resolve the parole issue.  See

EH Ex. 113.  Even if DPA Moran did not provide a benefit, Hicks perceived the resolution of

his status as a benefit, and he threatened to withhold his helpful testimony if that favor was not

provided.  Hicks's testimony therefore violates the first two prongs of the Napue test: "(1) the

testimony (or evidence) was actually false, (2) the prosecution knew or should have known that

the testimony was actually false."  Zuno-Arce, 339 F.3d at 889.  The Court examines the

materiality of this testimony, below.

### D.    Materiality

As discussed in Section III.A above, the Washington Supreme Court ruled there was no

"Brady violation" because the evidence was not material.  The Court now examines whether this

decision is contrary to, or an unreasonable application of, clearly established law.  See, e.g., Dkt.

#258 at 22 ("[T]he dispute in this case centers on whether the withheld evidence was material.").

The Court has found two pieces of "Brady material" and one accompanying potential

Napue violation:  (1) the Kitsap County prosecutors' failure to disclose that Dyste had been a paid informant in an unrelated investigation with the same investigator; (2) DPA Moran's resolution of Hicks's parole status at Hicks's request; and (3) DPA Moran's elicitation of false testimony from Hicks suggesting that Hicks neither received nor sought a benefit in exchange for his testimony.  Importantly, this information impacts the credibility of witnesses who testified that Gentry confessed to the murder.  See Arizona v. Fulminante, 499 U.S. 279, 296 (1991) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him[.]") (quotation marks and citation omitted).

In Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2008), a pre-AEDPA case, the Ninth Circuit recently held:

> The materiality analysis proceeds differently for Brady and Napue claims. Whereas a Brady violation is material when "there is a reasonable probability that . . . the result of the proceeding would have been different," Bagley, 473 U.S. at 682 (emphasis added), a Napue violation requires that the conviction be set aside whenever there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." Hayes v. Brown, 399 F.3d 972, 985 (9th Cir. 2005) (en banc) (emphasis added) (internal quotation marks omitted).

Id. at 1076 (alterations in original).  Based on this recent formulation[12] of the Brady/Napue materiality inquiry,[13] the Court first considers the single potential Napue violation in this case to

_____

[12]  The Court notes that the Ninth Circuit's holding in Jackson appears be in tension with Morris, which held that "[t]he test for prejudice for a Mooney-Napue claim is the same as that for materiality in a Brady claim.  That is, [the court] must decide whether, despite the use of perjured testimony, Petitioner received a 'trial resulting in a verdict worthy of confidence.'" Morris, 447 F.3d at 745 (quoting Kyles, 514 U.S. at 434) (internal citation omitted).  The Morris opinion distinguished this rule from United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991), which was cited favorably in the Ninth Circuit for the proposition that "if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" N. Mariana Islands v. Bowie, 243 F.3d 1109, 1114 (9th Cir. 2001) (quoting Wallach).  To the extent that Morris and Jackson opinions are in conflict, the Court here analyzes Gentry's claim under Jackson's more restrictive formulation of the Brady/Napue materiality inquiry.

[13]  Respondent's assertion that "although the Napue claims are separate from the Brady claims, his Napue claims necessarily fail if the Brady claims fail" is incorrect based on Jackson's holding that Napue and Brady claims must be considered separately before being analyzed collectively.  Dkt. #267 n.1.

ORDER ON PETITION FOR
HABEAS RELIEF BASED ON
BRADY AND NAPUE VIOLATIONS - 17

determine "whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury." Jackson, 513 F.3d at 1076 (quoting Hayes, 399 F.3d at 985) (emphasis added). If so, habeas relief must be granted. Id. If the potential Napue violation here is not material standing alone, the Court considers the Napue and Brady material collectively to determine "whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jackson, 513 F.3d at 1076 (quoting Bagley, 473 U.S. at 682 (emphasis added) (internal quotation marks omitted)). In order to make this determination, "the withheld evidence must be analyzed 'in the context of the entire record.'" Benn v. Lambert, 283 F.3d 1040, 1053 (9th Cir. 2002) (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)). The Court must conclude that petitioner received a "trial resulting in a verdict worthy of confidence." Morris, 447 F.3d at 745 (quoting Kyles, 514 U.S. at 434) (internal citation omitted).

### 1. Materiality of the single potential Napue violation

The single potential Napue violation in this case is DPA Moran's elicitation of false testimony from Hicks suggesting that Hicks neither received nor sought a benefit in exchange for his testimony. Based on a review of the entire record, the Court concludes that there is no reasonable likelihood that the false testimony that Hicks testified out of the goodness of his own heart, rather than for a benefit, could have affected the judgment of the jury. 16 REC 8761-62 ("Q. Mr. Hicks, why are you testifying today. A. To do what's right.").

Hicks's credibility was seriously challenged at trial. Defense counsel obtained significant amounts of impeachment evidence, which he used to great effect in Hicks's cross-examination. Defense counsel recited a litany of crimes that Hicks had been convicted of or plead guilty to over a twenty-year period. Along the way, Hicks had adopted a handful of aliases that he admitted using in order to avoid more severe punishments. The most damning was the use of an alias that resulted in a perjury conviction (in front of the very same judge presiding in the Gentry case), the worst possible blow to a witness's credibility. See 16 REC 8786-92. The

impeachment value of a mere token benefit in exchange for Hicks's testimony is extremely weak in view of the other available impeachment material.

As the Court observed at the evidentiary hearing, Hicks's earnest demeanor lends credibility to his testimony, underscoring the importance of the availability of all impeaching evidence for the defense. However, even seventeen years ago, Hicks could be and was revealed for what he is: an unreliable, manipulative, lying career criminal. Therefore, as to Hicks's arguably false testimony, it is not clear that Hicks had any credibility when he insisted that he would neither accept nor expect anything for his testimony. Even if the jury believed Hicks, his credibility would not have been meaningfully affected if he had to qualify his statement by conceding that DPA Moran had helped him sort out a purely administrative problem. Although it is a benefit that he received, it is not the kind of significant benefit received by the witnesses in Jackson that would undermine his credibility—no sentence was shortened, no charges were dropped, and he was still was going back to prison.[14]

In Hovey v. Ayers, 458 F.3d 892 (9th Cir. 2006), the petitioner claimed that the prosecution violated Napue by failing to correct testimony from a jailhouse informant Thomas

---

[14] The materiality of the potential Napue violation in this case is distinguishable from the Napue violation in Jackson. First, the magnitude of the benefit Hicks received in Gentry's case—clarification of his parole status—pales in comparison to the benefits received by the two Jackson jailhouse witnesses. For example, "Mikles was provided significant inducements in exchange for his testimony against Jackson," and "[i]n the end, Mikles received everything that he had requested: He was released from his six-year sentence, his parole hold was lifted, fifteen pending charges against him were dropped entirely, and he received a probationary sentence with no time in custody on a pending armed robbery conviction." Jackson, 513 F.3d at 1072. The Ninth Circuit also highlighted the magnitude of the benefit provided to the other jailhouse witness, finding that a "jury could easily find that McFarland, facing an unknown sentence for a serious crime, would greatly appreciate the chance to serve out his sentence close to his family and hence would find significant value in the prosecutor's promise." Id. at 1077. Thus, the impeachment value of the evidence at issue in Jackson far exceeds the impeachment value of the benefit provided to Hicks. Furthermore, Hicks' testimony played a much smaller part in the State's case against Gentry than the pivotal role the jailhouse witnesses performed in Jackson: "Mikles and McFarland were the two key witnesses for the finding of intent to cause death[.]" Id. at 1078. Finally, the factual predicate of Jackson distinguishes it from Gentry's case. Jackson involved the complexity of determining the involvement of multiple potential codefendants in two separate homicides occurring weeks apart. Gentry's case involves a single defendant and a single incident.

ORDER ON PETITION FOR
HABEAS RELIEF BASED ON
BRADY AND NAPUE VIOLATIONS - 19

Hughes that he received "no promises" in exchange for his cooperation in the State's case against Hovey.  Id. at 919.  The Ninth Circuit concluded that the failure to correct Hughes's false testimony did not demonstrate any reasonable likelihood that the false testimony could have affected the jury's verdict because:  (1) the jurors heard ample evidence about Hughes's criminal record, (2) the defense demonstrated that Hughes was a "sophisticated actor," and (3) the defense successfully characterized the testimony from Hughes as "unreliable."  Id. at 921.

It is the same in this case.  The jury heard extensive evidence about Hicks's criminal record, the defense showed Hicks to be a sophisticated career criminal, and demonstrated that Hicks's testimony was unreliable by extensive impeachment evidence including the perjury conviction.  Accordingly, the Court denies petitioner's Napue claim as to Hicks for these reasons.  Having concluded that the single potential Napue violation could not have affected the jury's judgment, the Court now turns to the collective consideration of the Napue and Brady material.

## 2.    Collective consideration of Napue and Brady material

The Court must assess the cumulative effect of the Brady and Napue material on the outcome of the proceedings in the Gentry trial, including the guilt and penalty phase.  Kyles, 514 U.S. at 436 ("The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item."); Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1997) ("In deciding whether the withheld evidence satisfies this [materiality] standard, we evaluate its effect cumulatively, not item-by-item") (citing Kyles, 514 U.S. at 436); Dkt. #258 at 22 ("[I]n determining whether the jury's guilty verdict deserves this Court's confidence, the Court must evaluate the cumulative impact of all pieces of suppressed evidence, rather than assessing each in a piecemeal fashion.").

### (a)    Guilt Phase

The Court concludes that the Brady and Napue material is not prejudicial to Gentry when considered collectively in the context of the evidence presented at the guilt phase of the trial.

First, the primary evidence against Gentry was the DNA analysis. One DNA test showed that a hair, that of Gentry's brother, which was likely in Gentry's clothes, was at the scene of the crime. The second DNA test on blood found on one of Gentry's shoes determined that the blood matched only that of 0.18% of Caucasians, including the victim. That blood was on a shoelace; the shoes otherwise had been recently cleaned. The jury found the aggravated circumstance of murder for the purpose of concealing the perpetrator's identity because evidence at the scene showed that the victim was attacked first in one spot before being taken to another spot, where she was then killed.

Second, both Dyste and Hicks were thoroughly and effectively impeached on cross-examination. Dyste conceded that although he claimed Gentry's crime allegedly bothered him so much, he did not mention it to anyone until he was being questioned in connection with another crime, nine months later. See 15 REC 8617. Dyste also recounted his extensive criminal record, including that he was in the county jail when he first gave a taped statement to Detective Wright about Gentry's confession to him. Id. at 8619-20. Further, Dyste testified that, during the taped statement, he had referred to the card game he played with Gentry as a "nigger" card game and also that he never mentioned the word "bitch" in that initial statement. Id. at 8623; 8625. As a result, his further impeachment by revealing to the jury his status as a paid informant in another investigation would be "merely cumulative." United States v. Marashi, 913 F.2d 724, 732-33 (9th Cir. 1990) (finding no Brady violation where further impeachment evidence would not have allowed defense counsel to further discredit witness). In addition to his criminal record and use of racial slurs, defense counsel already had strong circumstantial evidence to imply that Dyste hoped for benefits in exchange for his cooperation. Further evidence would have had an insignificant impact on Dyste's credibility.

As discussed above, Hicks faced even more serious challenges to his credibility than did Dyste, and was shown to be a lying career criminal. The Court finds that defense counsel Jeff Robinson effectively demonstrated this to the jury at Gentry's trial, and that evidence of this

letter and the State's response would have been merely cumulative. See, e.g., Barker, 423 F.3d at 1098 ("The withheld convictions were cumulative icing on an already crumbling cake.").

### (b) Penalty Phase

"In assessing prejudice [in the penalty phase], we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534 (2003). Although Dyste and Hicks did not testify in the penalty phase, the Court must consider the "totality of the evidence" in order to determine whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Strickland v. Washington, 466 U.S. 668, 696 (1984). Because the jury was instructed in the penalty phase to consider "the testimony of the witnesses and the exhibits admitted into evidence in phase one of this trial and during the special sentencing proceeding," the Court will consider the possible impact of Dyste and Hicks's testimony on the jury's decision in the penalty phase proceeding. See 19 REC 10481.

The prosecution never mentioned Dyste and Hicks during the penalty phase. See 19 REC 10349-10534. Instead, Moran focused on Gentry's potential future dangerousness, based on his extensive criminal record, which included rape with a deadly weapon.[15] Id. at 10368-10384; 10492-94; In re Gentry, 137 Wn.2d at 386 ("In addition to Mr. Holden's testimony, the State presented documentary evidence showing Gentry's prior convictions for manslaughter, rape, and two burglaries."). Moran also spoke at length about the victim's father's moving testimony about his daughter. Id. at 10501-02; see also id. at 10367:15-18 ("Q. Do you think about Cassie often? A. [Mr. Holden] Everyday Cassie goes through my mind. That's the first thing I do in the mornings [I] get up and kind of look up and say, 'Hello, Cassie.'"); In re Gentry, 137 Wn.2d

---

[15] Id. at 10494:4-11 ("And what happened in Kitsap County? Well, on April 23rd, 1988, this defendant committed the crime of Rape with a Deadly Weapon. And he committed it against a woman. And her name doesn't need to be repeated in this court, but it's in that Judgment and Sentence. And, ladies and gentlemen, on April 23rd, Cassie Holden was still alive. She was not alive fifty-one days later, on June 13th, 1998. Fifty-one days later.").

at 407. Finally, Moran reminded the jury of the crime scene, where blood marks and the state of the victim's body spoke of a vicious and brutal end to her life. See 19 REC 10499-10500. Although petitioner focuses on the fact that Dyste's report that Gentry described his victim as a "bitch" could have been the key factor in the jury's determination that there were not sufficient mitigating circumstances to merit leniency, DPA Moran mentioned this term only once in his closing argument, which was provided to give context to Mr. Holden's penalty phase testimony.[16]

In Strickler, a key prosecution witness named Anne Stoltzfus gave a dramatic account of the events leading up to the victim's abduction. 527 U.S. at 266. The prosecution, however, failed to turn over certain documents prepared by Stoltzfus that the Supreme Court concluded constituted Brady material. Id. at 282 ("[W]ith respect to at least five of those documents [with impeaching character], there is no dispute about the fact that they were known to the State but not disclosed to trial counsel."). Despite the failure to disclose the Brady material, the narrow issue was whether Strickler had established the showing of prejudice necessary to establish a Brady violation. Id. ("[W]hether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry—that is the most difficult element of the claimed Brady violation in this case."). In attacking his death sentence, Strickler contended that he suffered prejudice from the failure to disclose the Stoltzfus documents because her testimony impacted the jury's decision during the penalty phase. Id. at 295. The Court held there was no Brady violation, however, because Stoltzfus's testimony "did not relate to his eligibility for the death sentence and was not relied upon by the prosecution at all during its closing argument at the penalty phase," and therefore Strickler had not shown that there was reasonable probability that his sentence would have been different had the Brady material been disclosed. Id. at 295. Although Stoltzfus's

---

[16] Id. at 10500:17-25 ("And what you saw and what you heard at the guilt phase was not that Cassie Holden was this defendant's bitch, but that she was a little girl, out looking for some flowers. . . . What you saw and heard was Frank Holden's little girl, the same little girl who wanted twins, who wanted to be a writer.").

otherwise un-impeached testimony showed the petitioner to be a "violent, aggressive person," the Court noted that other available facts were equally unflattering. Id. at 295-96.

This Court must follow Strickler and conclude that the lack of additional impeachment evidence and the presentation of technically false testimony did not prejudice Gentry in the penalty phase of his trial. Although Dyste and Hicks testified that Gentry crassly referred to his victim as "bitch," the prosecutor did not directly rely on this fact to argue for the death penalty. The In re Gentry dissent states "[i]n closing arguments in the penalty phase the prosecution again emphasized that Gentry had referred to his victim as his 'bitch,' potently juxtaposing Gentry's cruelty and callousness against the powerful image of an innocent young girl picking flowers" and concludes that "[t]his image would likely sway the mind of even the most merciful juror toward imposition of the death penalty." 137 Wn.2d at 420 (Sanders, J., dissenting). However, the In re Gentry majority's implicit determination that the single reference to the term "bitch" in the penalty phase closing is not material is reasonable given all of the other evidence presented during the closing.[17]

The cumulative impact of the Brady and Napue material does not undermine confidence

---

[17] Although the Ninth Circuit opinion in Barker counsels this Court to "review one state decision," the Court notes that on direct review the Washington Supreme Court highlighted the breadth of evidence supporting the death penalty in this case. See Barker, 423 F.3d at 1093; State v. Gentry, 125 Wn.2d 570, 657 ("[T]here is no sure way to know how much the victim suffered before she died, but the apparent struggle through the forest indicates suffering and terror before she died. A brutal murder involving substantial conscious suffering of the victim makes the murderer more deserving of the death penalty."); 657 ("The Defendant's prior criminal record showed a history of violent behavior. He had killed before and had raped a 17-year-old girl at knife point not long before this murder. The Defendant's death sentence is not disproportionate on the basis of his criminal record."); 658 ("We consider it particularly important in this case that the Defendant had been convicted of a prior violent felony which had resulted in the victim's death, that shortly before this murder the Defendant had raped a teenage girl at knife point, that the Defendant murdered an innocent child, that the child suffered substantial pain and terror before her death and that the mitigating circumstances were relatively weak. Given the brutal nature of the crime, the tender years of the victim, the prior convictions of the Defendant and the lack of compelling mitigating circumstances, we conclude that the sentence was not excessive or disproportionate.").

in the outcome of Gentry's penalty phase proceeding. In Gentry's case, as in <u>Strickler</u>, "'considerable forensic and other physical evidence link[ed] [the defendant] to the crime' and supported the capital murder conviction." <u>Banks v. Dretke</u>, 540 U.S. 668, 701 (2004) (quoting <u>Strickler</u>, 527 U.S. at 293) (alteration in original).

After taking all the evidence into consideration, the Court concludes that Gentry has not shown a reasonable probability that the result of the state court proceeding would have been different had the exculpatory evidence been disclosed. Therefore, this Court concludes that the Washington Supreme Court's ruling that the exculpatory evidence was not material is not contrary to, or an unreasonable application of, clearly established law.

**E.  Detectives Wright and Wagner**

The stated purpose of the Court's evidentiary hearing included the exploration of possible <u>Brady</u> and <u>Napue</u> violations with regard to Detectives Doug Wright and Smed Wagner. <u>See</u> Dkt. #156 at 4. Other than Wright's relationship with Dyste, discussed above, the Court finds that petitioner has failed to present evidence and argue in support of any <u>Brady</u> or <u>Napue</u> violations with regard to these investigators. These claims are denied.

## IV.  CONCLUSION

For the foregoing reasons, petitioner's petition for a writ of habeas corpus is DENIED with regard to all of petitioner's <u>Brady</u> and <u>Napue</u> violation claims for (1) Brian Dyste, (2) Timothy Hicks, (3) Doug Wright, and (4) Smed Wagner.

DATED this 4th day of September, 2008.

*Mark S Lasnik*

Robert S. Lasnik
United States District Judge

ORDER ON PETITION FOR
HABEAS RELIEF BASED ON
<u>BRADY</u> AND <u>NAPUE</u> VIOLATIONS - 25