UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JONATHAN LEE GENTRY,

Petitioner,

v.

STEPHEN SINCLAIR,

Respondent.

Case No.  C99-0289L

ORDER GRANTING
RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING
PETITIONER'S CROSS-MOTION FOR
SUMMARY JUDGMENT, AND
ORDER DENYING AMENDED
HABEAS PETITION

# I.  INTRODUCTION

This matter comes before the Court on "Respondent's Motion for Summary Judgment" (Dkt. #272) and Jonathan Lee Gentry's ("petitioner" or "Gentry") "Cross Motion for Summary Judgment" (Dkt. #275).  On September 8, 2008, the Court held oral argument on the motions and heard from both parties' counsel.  For the reasons set forth below, the Court grants respondent's motion for summary judgment, denies Gentry's cross-motion for summary judgment, and denies Gentry's amended habeas corpus petition.

# II.  DISCUSSION

## A.    Procedural history

Gentry faces a death sentence in Washington for murdering 12-year-old Cassie Holden on June 13, 1988.  After approximately eight weeks of motion hearings and a six-week trial, the jury found defendant guilty of premeditated first degree murder and felony first degree murder,

1 and also found the aggravating circumstance that the murder was committed to conceal the

2 identity of the person committing a crime.  24 REC 13461-13462.  In the penalty-phase, the jury

3 found that there were not sufficient mitigating circumstances to merit leniency, and Gentry

4 received a death sentence.  Id. at 13591.

5     Gentry filed a direct appeal of his conviction and sentence to the Washington Supreme

6 Court, presenting a total of nineteen separate issues for review.  On January 6, 1995, the

7 Washington Supreme Court affirmed Gentry's conviction and death sentence in an one-hundred-

8 and-twelve-page, 6-3 opinion.  See State v. Gentry, 125 Wn.2d 570 (1995).  The United States

9 Supreme Court denied Gentry's petition for a writ of certiorari on October 2, 1995.  Gentry v.

10 Washington, 516 U.S. 843 (1995).  Thereafter, on October 5, 1995, the Supreme Court of

11 Washington issued its mandate, and on November 2, 1995, the Kitsap County Superior Court set

12 December 5, 1995 for Gentry's execution.  See 35 REC 18846 (Mandate); 18851-18852 (Death

13 Warrant).

14     On November 6, 1995, Gentry filed a motion for stay of execution pending the filing and

15 resolution of a personal restraint petition ("PRP"), Washington's mechanism for collateral

16 challenges.  See 35 REC 18894-18895.  On November 14, 1995, the Washington Supreme Court

17 stayed Gentry's execution pending the adjudication his PRP.  Id. at 18895 (ordering stay of

18 execution).  On February 18, 1999, the Washington Supreme Court denied Gentry's PRP in a

19 forty-eight-page, 7-2 opinion.  See In the Matter of the Personal Restraint Petition of Jonathan

20 Lee Gentry, 137 Wn.2d 378, 400 (1999) ("In re Gentry"), amended by 1999 Wash. LEXIS 448

21 (June 30, 1999).  After the decision on the PRP, Gentry filed his "First Amended Petition for

22 Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254" with this Court.  See Dkt. #47

23 (hereinafter "Amended Petition" or "Dkt. #47").  The Court stayed Gentry's execution pending

24 resolution of this habeas proceeding.  See Dkt. #29.

25     In total, during the history of this case, Gentry has been represented by eight attorneys.

26

27 ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28 DENYING AMENDED HABEAS PETITION          -2-

Jeffrey Robinson and Frederick Leatherman represented Gentry at trial.  On direct appeal, Robert Gombiner and Michael Iaria represented Gentry along with Mr. Leatherman.  Scott Englehard, Julie Spector,[1] and Meredith Rountree represented Gentry during the PRP proceeding.  Finally, Brian Tsuchida,[2] Meredith Rountree and Scott Englehard have represented Gentry in this federal habeas proceeding.

**B.    Factual background**

On June 13, 1988, at approximately 4:30 p.m., Cassie Holden went for a walk near her mother's home in Bremerton, Washington, but did not return for dinner.[3]  State v. Gentry, 125 Wn.2d at 579.  Her body was discovered two days later behind a large log at the bottom of a footpath that extended from a trail in the woods near a Bremerton-area golf course.  Id.  Cassie's eyeglasses, earing, and a bouquet of flowers were found approximately 148 feet up the footpath on, and near the main trial, and she appeared to have been sexually assaulted given that she was partially undressed.  Id.  Her blue sweatshirt had also been removed from one arm and pulled up, partially covering her face.  Id.  She had been struck in the head approximately eight to fifteen times, suffering ten "significant injuries."  Id.

Kitsap County sheriff deputies investigated the murder scene and determined that there was blood extending from the main trail, down the footpath about 148 feet to where Cassie was discovered.  Id.  They found a 2.2-pound rock that was believed to be the murder weapon—it had blue fibers matching the sweatshirt embedded into it, and also red marks that looked like blood.  Id.  The autopsy revealed that Cassie had been killed by one of the blows to her head,

---

[1]  The Honorable Julie Spector is now a King County Superior Court judge.

[2]  The Honorable Brian Tsuchida recently withdrew his appearance in this case upon his appointment as a United States Magistrate Judge.  See Dkt. ##279; 280.

[3]  The Court recites the facts from the Washington Supreme Court's opinion on direct appeal, which have been confirmed by the Court's independent review of the state-court record.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -3-

1    but it did not show the order in which the blows were delivered or which blow killed Cassie, and

2    it did not conclusively show that she had been raped.  Id.

3        As part of the autopsy, several loose hairs consistent with Cassie's hair were removed

4    from her body.  Id.  Two "Negroid" hair fragments were also recovered from her t-shirt, a coarse

5    brown hair believed to be Caucasian pubic hair was found on her thigh, and a red pigmented hair

6    was found on her shoe.  Id. at 580.  There was no identification linked with the Caucasian hair,

7    but the Negroid hair was determined to be consistent with Gentry's brother's arm hair.  Id.

8    Gentry's brother was not in Kitsap County at the time of Cassie's murder, however, evidence

9    showed that Gentry lived with his brother's family and Gentry occasionally wore his brother's

10   clothes.  Id.

11       After the investigation focused on Gentry, his residence was searched and clothing,

12   including a pair of shoes, was seized.  Id.  Examination of the shoes indicated that blood had

13   been wiped from them.  Id.  Bloodstains were found on the shoe's laces and these stains were

14   subjected to a series of scientific tests, including:  ABO, gamma marker (GM), haptoglobin

15   (Hp), DQ-alpha polymerase chain reaction DNA (PCR DNA), and phos-phoglucomutase

16   (PGM).  Id.  According to the State's experts, none of the tests performed on the bloodstains

17   from Gentry's shoelaces eliminated Cassie as the source of the blood.  Id.  Because ABO, GM,

18   Hp, and PCR DNA are genetically independent factors, the State's experts used the product rule

19   to derive a cumulative frequency showing the percentage of the population from which the blood

20   found on Gentry's shoelaces could have originated.  Id.

21       For the ABO test, one of the bloodstains was type O and Cassie had type O blood, which

22   is found in 44.5% of the Caucasian population.  Id.  GM testing revealed that both shoelace

23   bloodstains were type 1,2,3,11, as was Cassie's blood, and this type is found in 14% of the

24   Caucasian population.  Id.  The Hp test showed that one of the shoelace bloodstains was Hp type

25   "2," the same as Cassie's blood, and Hp type "2" is present in 36.1% of the Caucasian

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28   DENYING AMENDED HABEAS PETITION          -4-

population.  Id. at 581.  The PCR DNA testing on the bloodstains from both shoelaces showed PCR type 1.2, 3, the same as Cassie's blood.  Id.  The frequency of occurrence of type 1.2, 3 is approximately 8% in both the Caucasian and African American populations.  Id.  The scientist who conducted the PCR DNA testing testified that the percentage of Caucasians with type O blood with GM 1,2,3,11, Hp type "2," and PCR DNA of 1.2, 3 was 0.18%.  Id.  The hair found on Cassie's t-shirt was subjected to PCR testing and showed a PCR type 1.2, 1.2, which did not match Gentry, but matched his brother's type.  Id.

There was other evidence presented at trial linking Gentry to the murder, including three people who reported seeing a man matching Gentry's description near the crime scene around the time of the murder, and three former jailmates of Gentry who testified that he admitted to them that he had killed someone.  Id.  The factual background regarding the jailhouse witnesses is detailed in the Court's prior rulings on Gentry's Brady/Napue claims involving these witnesses.  See Dkt. #283 at 3-6; Dkt. #284.

**C.    Gentry's habeas claims**

In his Amended Petition, Gentry presents twelve separate claims for relief.  As the Court explains in Section II.2.D below, the Court has denied some of these claims in prior orders.  Given that respondent has moved to dismiss Gentry's entire Amended Petition on summary judgment, for clarity in the record, the Court in this order discusses each claim.  Listed below are the twelve claims and the corresponding paragraphs from the Amended Petition pertaining to each claim.[4]

A.  Potential Juror No. 22 was erroneously excused (¶¶11; 30-43);

B.  Ineffective assistance of counsel ("IAC") for failing to investigate and present expert

---

[4]  Respondent has identified Gentry's claims alphabetically based on Gentry's headings in the Amended Petition.  In his opposition to respondent's summary judgment motion, Gentry also tracks these alphabetical claim headings.  See Dkt. #275 at 3.  Accordingly, for clarity in the record, the Court also identifies the twelve separate claims alphabetically in the same order presented in the Amended Petition.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -5-

testimony regarding the crime scene evidence (¶¶14.3; 44-60);

C.  IAC for failing to rebut the State's evidence that the fatal head injuries were caused by two blows rather than one (¶¶14.4; 61-79);

D.  IAC for failing to rebut the State's DNA and serological statistical probability evidence (¶¶14.5; 80-111);

E.  The State violated <u>Brady v. Maryland</u> by failing to disclose impeachment evidence about the three jailhouse witnesses and two detectives (¶¶12; 112-222);

F.  The State violated <u>Napue v. Illinois</u> by presenting false testimony from the three jailhouse witnesses (¶¶13; 223-225);

G.  IAC for failing to fully investigate the three jailhouse witnesses and Detective Wright (¶¶14.1; 14.2; 226-232);

H.  IAC for failing to present mitigating evidence in the penalty phase regarding Gentry's mental condition (¶¶14.6; 246-302);

I.  IAC for failing to redact a judgment and sentence during the penalty phase (¶¶14.7; 310-312);

J.  The admission of victim impact testimony resulted in an unfair sentencing proceeding and constituted IAC (¶¶15; 325-345);

K.  Jury instruction number 10 (the "to convict" instruction) was erroneous and the penalty phase instructions failed to explain the jury's obligation to consider mitigating circumstances both individually and cumulatively, and these errors constituted IAC (¶¶14.8-14.10; 18; 21; 346-348); and

L.  The denial of discovery, an evidentiary hearing, and funds to retain experts and investigators in state post-conviction proceedings violated Gentry's constitutional rights (¶¶22; 349-363).

Before turning to the merits of these claims, however, the Court first addresses the

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -6-

1  summary judgment standard in relationship to Gentry's Amended Petition.

2  **D.  Analysis**

3      **1.  Summary judgment standard under 28 U.S.C. § 2254**

4      As a threshold matter, the parties dispute the extent to which summary judgment under

5  Fed. R. Civ. P. 56 is applicable to this § 2254 habeas case.  To be sure, "[t]he procedure on

6  applications for habeas corpus for state prisoners is a confusing amalgam, to be found in a

7  variety of different sources."  17B Wright, Miller, Cooper & Amar, <u>Federal Practice and</u>

8  <u>Procedure</u> § 4268, at 437-38 (2007).  The Rules Governing Section 2254 Cases in the United

9  States District Courts (hereinafter "Habeas Corpus Rules") establish that "[t]he Federal Rules of

10  Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these

11  rules, may be applied to a proceeding under these rules."  Habeas Corpus Rule 11.  As a general

12  matter, courts have found summary judgment motions appropriate in habeas corpus proceedings.

13  <u>Blackledge v. Allison</u>, 431 U.S. 63, 80 (1977); <u>Clark v. Johnson</u>, 202 F.3d 760, 764 (5th Cir.

14  2000) ("As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to

15  summary judgment, applies with equal force in the context of habeas corpus cases.").  In

16  Gentry's case, however, because he filed his federal habeas petition after the April 24, 1996,

17  enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat.

18  1214, the AEDPA amendments to 28 U.S.C. § 2254 apply.

19      The AEDPA "placed a new restriction on the power of federal courts to grant writs of

20  habeas corpus to state prisoners."  <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000) (O'Connor, J.,

21  concurring) ("<u>Williams</u>").  "AEDPA's purpose [is] to further the principles of comity, finality,

22  and federalism."  <u>Williams v. Taylor</u>, 529 U.S. 420, 436 (2000) ("<u>Williams II</u>").  "Federal

23  habeas corpus principles must inform and shape the historic and still vital relation of mutual

24  respect and common purpose existing between the States and the federal courts.  In keeping this

25  delicate balance [the Supreme Court has] been careful to limit the scope of federal intrusion into

26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
   SUMMARY JUDGMENT, DENYING PETITIONER'S
   CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION          -7-

1    state criminal adjudications and to safeguard the States' interest in the integrity of their criminal

2    and collateral proceedings." Id.

3           Under the AEDPA, this Court is not empowered to grant a writ of habeas corpus on a

4    claim that was adjudicated on the merits in state court unless that adjudication:

5           (1) resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established Federal law, as determined by the Supreme
6           Court of the United States; or
            (2) resulted in a decision that was based on an unreasonable determination of the
7           facts in light of the evidence presented in the State court proceeding.

8    28 U.S.C. § 2254(d); see Early v. Packer, 537 U.S. 3, 7-8 (2002) (per curium).  "Clearly

9    established Federal law, as determined by the Supreme Court of the United States" refers to the

10   Supreme Court's holdings at the time of the relevant state-court decision. Williams, 529 U.S. at

11   412.

12          Section 2254(d)'s "contrary to" and "unreasonable application of" clauses have

13   independent meaning. Williams, 529 U.S. at 404-05.  A state court decision is "contrary to"

14   clearly established federal law where the "state court arrives at a conclusion opposite to that

15   reached by the [Supreme Court] on a question of law" or "if the state court confronts facts that

16   are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result

17   opposite" the Supreme Court's decision. Id. at 405.  "A state court decision constitutes an

18   unreasonable application of Supreme Court precedent only if the state court decision is

19   objectively unreasonable.  That is, the state court decision must be 'more than incorrect or

20   erroneous.'" Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007) (quoting Cooks v.

21   Newland, 395 F.3d 1077, 1080 (9th Cir. 2005)).  At bottom, "[t]he question under AEDPA is

22   not whether a federal court believes the state court's determination was incorrect but whether

23   that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan,

24   127 S. Ct. 1933, 1939 (2007).  In light of these standards, Gentry "is not entitled to habeas relief

25   under 28 U.S.C. § 2254(d)(1) unless the Washington court's decision 'was contrary to or

26

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28   DENYING AMENDED HABEAS PETITION          -8-

1    involved an unreasonable application of [the Supreme Court's] applicable holdings.'" <u>Stenson</u>,

2    504 F.3d at 881 (quoting <u>Carey v. Musladin</u>, 127 S. Ct. 649, 653 (2006)) (alternation in

3    original).

4         The Court may also grant relief under 28 U.S.C. § 2254(d)(2) if the state court

5    adjudication "was based on an unreasonable determination of the facts in light of the evidence

6    presented in the State court proceeding." <u>Id.</u> (quoting § 2254(d)(2)).  The AEDPA, however,

7    "requires federal habeas courts to presume the correctness of state courts' factual findings unless

8    applicants rebut this presumption with 'clear and convincing evidence.'" <u>Schriro</u>, 127 S. Ct. at

9    1939-40; (quoting 28 U.S.C. § 2254(e)(1)); <u>see</u> <u>Stenson</u>, 504 F.3d at 881 (quoting <u>Miller-El v.</u>

10   <u>Cockrell</u>, 537 U.S. 322, 340 (2003) (holding the court "may not overturn them 'absent clear and

11   convincing evidence' that they are 'objectively unreasonable'").

12        Courts have noted the potential discord in applying the AEDPA under summary judgment

13   standards.[5]  Under Rule 56(c), summary judgment is proper "if the pleadings, the discovery and

14

15       [5]  <u>See</u> <u>Smith v. Cockrell</u>, 311 F.3d 661, 668 (5th Cir. 2002) ("While, as a general principle, Rule
16   56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the
     context of habeas corpus cases, the rule applies only to the extent that it does not conflict with the habeas
17   rules.  Therefore, § 2254(e)(1)—which mandates that findings of fact made by a state court are
     'presumed to be correct'—overrides the ordinary rule that, in a summary judgment proceeding, all
18   disputed facts must be construed in the light most favorable to the nonmoving party.") (internal citation
     and quotation marks omitted), <u>abrogated on other grounds by</u> <u>Tennard v. Dretke,</u> 542 U.S. 274 (2004).
19        At oral argument, Gentry's counsel asserted that Gentry is entitled to an evidentiary hearing on
20   claims where he contends there are disputed issues of material fact in the state court record, which in turn
     precludes entry of summary judgment at this stage of the litigation.  This assertion, however, proves too
21   much.  Under Habeas Corpus Rule 8(a), "[i]f the petition is not dismissed, the judge must review the
     answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7
22   <u>to determine whether an evidentiary hearing is warranted.</u>"  <u>Id.</u> (emphasis added).  Habeas Corpus Rule
     11 also provides that "[t]he Federal Rules of Civil Procedure, <u>to the extent that they are not inconsistent</u>
23   <u>with any statutory provisions</u> or these rules, may be applied to a proceeding under these rules."  <u>Id.</u>
24   (emphasis added).  Accordingly, 28 U.S.C. § 2254(e) trumps Fed. R. Civ. P. 56 to the extent that the
     summary judgment standard conflicts with the AEDPA.  Therefore, when the Washington Supreme
25   Court entered a finding, the finding is presumed to be correct and Gentry has the burden to rebut the
26   "presumption of correctness" by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  And, where

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28   DENYING AMENDED HABEAS PETITION            -9-

1   disclosure materials on file, and any affidavits show that there is no genuine issue as to any

2   material fact and that the movant is entitled to judgment as a matter of law," and to this rule,

3   courts apply the well-settled doctrine that facts must be construed in the light most favorable to

4   the party opposing summary judgment.  See Scott v. Harris, 127 S. Ct. 1769, 1776 n.8 (2007);

5   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 261 n.2 (1986) (Brennan, J., dissenting)

6   (asserting "the doctrine that all evidence must be construed in the light most favorable to the

7   party opposing summary judgment.").  This doctrine, however, conflicts with § 2254(e)(1)'s

8   provision that "a determination of a factual issue made by a State court shall be presumed to be

9   correct[; and] [t]he applicant shall have the burden of rebutting the presumption of correctness

10  by clear and convincing evidence."  In analyzing Gentry's twelve separate claims for relief, the

11  Court is mindful of this tension between the AEDPA's dictates, Habeas Corpus Rule 11, and the

12  summary judgment standard.

13        **2.     Gentry's twelve habeas claims**

14        As discussed in Section II.C above, Gentry asserts twelve separate claims in his Amended

15  Petition.  The Court considers each claim, in the order presented in the Amended Petition,

16  below.

17        **(a)     Excusal of Juror 22**

18        Gentry's first habeas claim contends that Juror 22 was qualified to sit on the jury, but was

19  unconstitutionally excused.  See Dkt. #47 ("Claim A") at ¶¶11; 30-43.  In January 2006, Gentry

20  moved for summary judgment on Claim A.  See Dkt. #184.  The Court denied Gentry's motion.

21  See Dkt. #270 (Order on Motion for Summary Judgment).  The parties have now filed cross-

22  motions on this claim and concede that there are no disputed issues of fact precluding entry of

23  ────────────────────

24  Gentry failed to develop the factual basis of a claim in the state proceeding, he is not entitled to an
    evidentiary hearing unless, among other things, he shows that "the facts underlying the claim would be

25  sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable

26  factfinder would have found the applicant guilty of the underlying offense."  Id. at § 2254(e)(2)(B).

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28  DENYING AMENDED HABEAS PETITION            -10-

summary judgment.  See Dkt. #275 at 13 ("There are no disputed material facts, and the parties have previously briefed this issue.").

Significantly, the record before the Court on this claim is the same as when the Court denied Gentry's January 2006 summary judgment motion.  The parties acknowledge that the only event since the Court's August 2006 order which may impact Claim A is the Supreme Court's recent decision in Uttecht v. Brown, 127 S. Ct. 2218 (2007).  See Dkt. #275 at 14 ("The only new development since Mr. Gentry filed [his summary judgment motion] is the Supreme Court's decision in Uttecht v. Brown[.]").[6]

In the August 2006 order, the Court adjudicated Claim A by finding first that "the trial court reasonably applied the substantial impairment standard in excusing Juror 22," and second "[w]ithout question, on several occasions, Juror 22 provided adequate grounds for a for-cause challenge under the Witt[7] substantial impairment standard" and therefore the Court "defer[red] to the trial court's conclusion that Juror 22's view on the death penalty substantially impaired his ability to follow the court's instructions."  Dkt. #270 at 11; 13.  The Supreme Court's reasoning in Uttecht reinforces the Court's August 2006 order because it amplifies that "[i]t is the trial court's ruling that counts" and "[c]ourts reviewing claims of Witherspoon-Witt error . . . especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror."

_____

[6] In Uttecht, the Supreme Court held that the trial court properly excused a juror for cause who equivocated about his ability to impose the death penalty and at times seemed confused about the law. Although the Supreme Court acknowledged that deference to the trial court "does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment," it held that when "there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful voir dire, the trial court has broad discretion."  Id. at 2230.  The Court finds under Uttecht, that with respect to Juror 22 in Gentry's case, there was lengthy questioning and the trial judge supervised a diligent and thoughtful voir dire.  See 10 REC 5431-5476.

[7] Wainwright v. Witt, 469 U.S. 412 (1985).

1   Uttecht, 127 S. Ct. at 2228, 2231.

2       Gentry has not advanced any additional arguments or evidence warranting

3   reconsideration of the Court's August 2006 order.  Therefore, his renewed cross-motion for

4   summary judgment on Claim A is denied.[8]  For the reasons set forth in the Court's August 2006

5   order, the Court also concludes that the state-court decision regarding Juror 22 was not contrary

6   to, or an unreasonable application of, clearly established federal law.  See Uttecht, 127 S. Ct. at

7   2230.  Accordingly, the Court grants respondent's motion for summary judgment and denies

8   Claim A of Gentry's Amended Petition.

9           **(b)    Investigation and expert testimony regarding crime scene evidence**

10       Respondent moves for summary judgment on Gentry's IAC habeas claim that his trial

11  counsel failed to investigate and present expert testimony regarding the crime scene forensic

12  evidence.  See Dkt. #47 ("Claim B") at ¶¶14.3; 44-60; Dkt. #272.  The Supreme Court's two-

13  part standard for analyzing ineffective assistance of counsel under Strickland v. Washington,

14  466 U.S. 668 (1984), was clearly established law at the time the Washington Supreme Court

15  issued its 1999 In re Gentry decision:

16       First, the defendant must show that counsel's performance was deficient.  This
         requires showing that counsel made errors so serious that counsel was not
17       functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
         Second, the defendant must show that the deficient performance prejudiced the
18       defense.  This requires showing that counsel's errors were so serious as to deprive
         the defendant of a fair trial, a trial whose result is reliable.
19
20  Strickland, 466 U.S. at 687.  In order to satisfy the first part of Strickland's test, Gentry must

21  "identify[] the acts or omissions 'that are alleged not to have been the result of reasonable

22  professional judgment[.]'"  Earp v. Ornoski, 431 F.3d 1158, 1173-74 (9th Cir. 2005) (quoting

23
24       [8]  Although Gentry reasserts his argument that "[a]s previously extensively briefed, the core of
     Mr. Gentry's contention is that because the trial judge did not correctly understand the applicable legal
25   standard, he improperly struck juror [22]," the Court explicitly rejected this argument in the August 2006
     order, stating "[t]his Court finds that the [Gentry] trial court reasonably applied the substantial
26   impairment standard in excusing Juror 22."  See Dkt. #275 at 14; Dkt. #270 at 11.

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
28   CROSS-MOTION FOR SUMMARY JUDGMENT, AND
     DENYING AMENDED HABEAS PETITION          -12-

1  Strickland, 466 U.S. at 690).  In his Amended Petition, Gentry contends that his "[t]rial counsel

2  were ineffective because they failed to investigate and present expert testimony regarding the

3  forensic evidence at the crime scene."  Dkt. #47 at ¶14.3.  There are two primary pieces of

4  evidence that Gentry claims his trial counsel failed to adequately investigate and contest with

5  expert testimony:  (1) the slight depression in the soil beneath Cassie Holden's head at her final

6  resting place; and (2) the broken stick beneath her head.[9]  Gentry contends that the State

7  depended on this evidence for its theory that Gentry delivered a fatal blow at Cassie Holden's

8  final resting place to show intent and premeditation in the guilt-phase and "also painted a picture

9  of a particularly brutal killing which the State used in arguing that a death sentence was

10  appropriate."  See Dkt. #47 at ¶52; Dkt. #275 at 7.

11      Habeas relief is proper on this claim if the Washington Supreme Court's decision was

12  either "contrary to, or involved an unreasonable application of" Strickland.  28 U.S.C. §

13  2254(d)(1).  In adjudicating Gentry's IAC claim on the crime scene evidence, the Washington

14  Supreme Court correctly used Strickland's two-part test as the controlling standard.[10]  Therefore,

15  the decision was not "contrary to" Strickland, and Gentry is entitled to habeas relief only if In re

16  Gentry involved an "unreasonable application" of Strickland or if it "was based on an

17  unreasonable determination of the facts in light of the evidence presented in the State court

18  proceeding."  28 U.S.C. § 2254(d)(1); (2).

19

20      [9]  See Dkt. #47 at ¶51 ("The State . . . argued that the existence of a broken stick and a one to

21  three inch depression under the victim's head proved that she was struck a fatal blow at the log as she lay
   on the ground."); Dkt. #275 at 6 ("Expert testimony would have established: . . . [t]he indentation in the

22  soil beneath the victim's head was likely not the result of any blow to the head, but instead the result of
   the weight of the head, the bleeding, and the soft surface of the soil; [and] the unbroken stick under the

23  victim's head strengthens this conclusion[.]").

24      [10]  See In re Gentry, 137 Wn.2d at 400-401 ("To prevail on this claim, Gentry must show that his

25  attorneys were 'not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment' and
   their errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'")

26  (quoting Strickland, 466 U.S. at 687)).

27  ORDER GRANTING RESPONDENT'S MOTION FOR
   SUMMARY JUDGMENT, DENYING PETITIONER'S
   CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28  DENYING AMENDED HABEAS PETITION        -13-

The Washington Supreme Court rejected Gentry's ineffective assistance of counsel claims regarding the crime scene evidence, stating:

> Gentry faults his attorneys for failing to consult with a forensics expert regarding the cause of Cassie's two most serious head injuries[.] . . . Gentry contends trial counsel should have consulted with an appropriate head injury expert. Defense counsel have now located a witness who says he might, after examining the evidence, be able to testify that the wound on the back of Cassie's head was not caused by a separate blow with the rock, but by her head being pushed back into a tree or branch when she was hit in the forehead.

> Gentry apparently wants to show Cassie was neither struck with the rock in the back of the head nor struck so hard in the front of the head that her head broke the branch under her head. His expert [James A. Newman] opines she may have been resting against a nearby tree when she was hit in the forehead, and the back of her head was injured by striking the tree. The expert [Kay M. Sweeney] also suggests that the branch was broken by the officer who moved it or in some other manner than the investigating officer concluded.

> It is inconceivable pursuing this line of investigation and introducing such testimony would have altered the outcome of trial. It is undisputed Cassie was struck between 8 and 15 times with a two-pound rock, including one blow in the forehead, through her sweatshirt, with sufficient force to cause a fatal injury. She also suffered an independently fatal injury to the back of her head. It hardly matters whether that injury was caused by a separate blow with the rock, or the blow to the front of her head was so hard as to cause two massive wounds.

In re Gentry, 137 Wn.2d at 402. The Court ultimately concluded "Gentry's trial counsel were not deficient in failing to consult additional experts to a degree that deprived Gentry of a fair trial." Id. at 404 (emphasis added). Despite this conclusion's recitation of both elements from Strickland, as the portion of the opinion set forth above discloses, the Washington State Supreme Court's decision focused on Strickland's "prejudice" inquiry. This application of Strickland is proper because "there is no reason for a court . . . to address both components of the [Strickland] inquiry if the defendant makes an insufficient showing of one[;] [i]n particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697.

Assuming, without deciding, that trial counsel's failure to investigate the crime scene evidence fell below the objective standard of reasonableness, as discussed below, the Court

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -14-

1   nevertheless concludes that the Washington Supreme Court's decision that there was no

2   resulting prejudice was not an "unreasonable application" of Strickland or "based on an

3   unreasonable determination of the facts."  Pinholster v. Ayers, 525 F.3d 742, 757 (9th Cir. 2008)

4   (citing Strickland, 466 U.S. at 677 (stating that a court may presume ineffective assistance to

5   reject a claim on prejudice grounds)).

6       The In re Gentry opinion expresses that there was no prejudice based on Gentry's trial

7   counsel's failure to present expert testimony to rebut the State's theory that a fatal blow was

8   delivered at Cassie Holden's final resting place because of the other evidence at trial.  In

9   reaching this conclusion, the Washington Supreme Court considered not only the trial court

10  record, but also the additional material submitted with Gentry's PRP, including a declaration

11  from Kay Sweeney, a forensic scientist and former head of the Washington State Crime Lab.

12  See 37 REC 19565-19578 (First Amended PRP); Ex. 56 (Sweeney Decl.) at 19979-19991.  In

13  the PRP proceeding, Mr. Sweeney was charged with opining on "whether certain evidence

14  tended to either corroborate or disprove the State's argument at trial that the victim was struck

15  with a fatal blow to her right temple at the location where her body was recovered ('final resting

16  place.')."  37 REC 19979.  Mr. Sweeney opined that the soil and the stick's brittleness could

17  have been tested in order to estimate the force necessary to cause the observed compaction of

18  the soil and the stick to break.  37 REC 19983-19985.  Mr. Sweeney reached no conclusions

19  regarding the soil indentation, but concluded that the stick could have been broken by one of the

20  detectives or the assailant.[11]  The Washington Supreme Court reasonably concluded that even

21

22  ───────────────

23      [11]  As respondent highlighted in the PRP proceeding, Mr. Sweeney's opinions regarding the stick
    are based on an incorrect factual predicate.  For example, in his declaration Mr. Sweeney notes that

24  "exhibit 30A is now a separate piece of stick," and then opines that "[t]his would indicate that the officers
    actually broke the stick at the scene, and it was not broken by the assault of the victim."  37 REC 19983

25  at ¶26.  In fact, the trial court record shows that exhibit 30A was a piece of the stick that broke off from
    exhibit 30 during trial.  See 17 REC 9072-9074; 9127-9128.

26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28  DENYING AMENDED HABEAS PETITION          -15-

1   with this additional information, the outcome of the trial would not have been different.

2          First, during Gentry's case-in-chief, Dr. Donald Reay, the King County Medical

3   Examiner, rebutted the State's theory behind the cause of the soil indentation by testifying that it

4   could have been caused either by a blow to the victim's head, or the weight of her body given

5   the amount of blood in the soil and the length of time that had elapsed before her discovery.[12]

6   17 REC 9167; 9173-9176.  Second, Dr. Reay's testimony contested the State's theory regarding

7   the broken stick.[13]

8          In the face of this contested evidence, the Washington Supreme Court concluded that the

9   outcome of the trial would not have been different based on its reasonable determination that the

10  evidence at trial showed Cassie was struck between eight and fifteen times[14] with a two-pound

11

12         [12] "Q.  If you assume that Cassie Holden's body was in the woods for a period of about a day-

13  and-a-half before she was found, and if you assume that her head, when her body was found, was in a
    depression of about two inches deep, and if you assume that testimony has been provided that there was

14  blood that had seeped down into the ground about ten inches, do you have an opinion, to a reasonable
    degree of medical certainty, about whether or not a blow would be required to have been struck in the

15  place where Cassie Holden was found, in order to cause the factual events to occur?

16         A. [Dr. Reay].  Oh, I have an opinion.  I don't think you can say.  I think that to the extent that
    you put the parameters in your hypothetical, I don't think there's enough information to say specifically

17  that it was a blow or pressure that was responsible for the depression."  17 REC 9174:22-9175:13.

18         [13] "Q.  If we hypothesize, Doctor, that Cassie Holden's body was carried from this point
    (indicating) to her final resting place, is it possible that either dropping the body in the area where she

19  landed may have broken the stick or that a person carrying her kneels down and breaks the stick with his
    knee or his foot; would that be possible, based on your knowledge of the way bodies are configured and

20  the way you carry a body?

21         A. [Dr. Reay].  Plus the character of the stick.  If it was very dry and very brittle, very minimal
    amounts of force can cause those things to fracture or break, and I think just what's been demonstrated

22  by counsel would be a sufficient explanation.  So I really don't have firm opinion about what happened."
    17 REC 9192:17-9193:5.  Notably, defense counsel relied on this testimony during the guilt-phase

23  closing argument.  See 18 REC 10143:18-24.

24         [14] "Q.  With having reviewed the photographs and also the [autopsy] report, would you concur

25  with Doctor Myster that there could be eight to fifteen, somewhere in that range, number of blows
    delivered to Cassie's head?

26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28  DENYING AMENDED HABEAS PETITION          -16-

1  rock,[15] including one blow in the forehead through her sweatshirt,[16] with sufficient force to cause

2  a fatal injury.[17]

3        This is not, however, the end of the inquiry in this federal habeas proceeding.  As result

4  of the Court's order granting Gentry's request for discovery of physical evidence taken from the

5  crime scene, Mr. Sweeney performed a forensic evaluation of the evidence, and Gentry

6  subsequently supplemented the record with Mr. Sweeney's March 10, 2006 forensic report.  See

7  Dkt. #156 (Order Regarding Discovery and Evidentiary Hearing); #251 (Sweeney Report).  In

8  the August 3, 2005 order regarding discovery, the Court also granted Gentry's request for leave

9  to depose Dr. Stuart Myster, the pathologist who performed the victim's autopsy and testified in

10  the State's case-in-chief.  See 14 REC 7287.  Gentry has now supplemented the record with the

11  transcript from Dr. Myster's December 2, 2005 deposition and the two accompanying exhibits.

12  See Dkt. #172 (Myster Dep.).

13        Gentry claims in his opposition to respondent's summary judgment motion that this

14

15        A. [Dr. Reay] Yes, perhaps more."  17 REC 9201:22-9202:1.

16        [15]  See 14 REC 7355:5-7357:8.

17        [16]  "Q.  Did you observe in the [autopsy] report some information about some blue fibers being

18  imbedded in Cassie's right, upper skull fracture?
        A. [Dr. Reay]  Yes, sir; correct.

19        Q.  And based on the fact of reviewing the photographs with the blue sweatshirt and some

20  information about a rock, did you examine any information about blue fibers being found on a rock?
        A.  I don't recall a report of blue fibers on a rock.  I do specifically recall blue fibers in the wound,

21  which means that that object should have been covering the wound at the time of the injury.
        Q.  That would be consistent with the blue sweatshirt pulled up over the area when the blow was

22  delivered?

23        A.  Yes, and I can't really conceive of any other reasonable explanation for it."  17 REC 9206:10-
   25 (emphasis added).

24
        [17]  "Q.  Do you agree with Doctor Myster that both the injuries, the injury to the front forehead

25  and the injury to the back, left, would have been capable of causing unconsciousness and death?

26        A. [Dr. Reay] Oh indeed, yes, very much so."  17 REC 9172:12-16.

27  ORDER GRANTING RESPONDENT'S MOTION FOR
   SUMMARY JUDGMENT, DENYING PETITIONER'S
   CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28  DENYING AMENDED HABEAS PETITION          -17-

additional material "would have established:  (a) There is a reasonable probability that the victim's fatal head injuries were caused by one blow rather than two;[18] (b) The fracture to the victim's forehead was likely not inflicted as she lay on the ground; (c) The indentation in the soil beneath the victim's head was likely not the result of any blow to the head, but instead the result of the weight of the head, the bleeding, and the soft surface of the soil; (d) The unbroken stick under the victim's head strengthens this conclusion; [and] (e) The assault lasted only seconds." Dkt. #275 at 6 (internal citations to the record omitted).  As respondent correctly observed in his reply, however, the additional material does not support these assertions.  See Dkt. #277 at 4-6.

First, contrary to petitioner, neither Dr. Myster nor Mr. Sweeney stated that the forehead fracture was likely not inflicted while Cassie Holden was on the ground.[19]  Second, although Gentry cites the March 2006 report, Mr. Sweeney did not opine on the likely cause of the soil indentation.  See Dkt. #251.  Third, Gentry cites Mr. Sweeney's March 2006 report to support the contention that the "unbroken stick under the victim's head strengthen's this conclusion." Dkt. #275 at 6.  However, the only reference to the stick in the report is "Exhibit[] #29 (small stick")," which Mr. Sweeney states "w[as] not examined at this time." Dkt. #251 (Sweeney Report) at 4.  Even if, for the sake of argument, Mr. Sweeney had examined this "unbroken stick," the Court finds based on Mr. Sweeney's declaration submitted in the PRP proceeding that it would not likely produce any reliable information at this point.[20]  Finally, contrary to his

---

[18]  This is the basis of Claim C, which the Court addresses in Section II.D.2(c) below.

[19]  In his response, Gentry cites pages 25 and 26 of Dr. Myster's deposition transcript in support of this proposition.  See also Dkt. #204 (Motion for evidentiary hearing) at 7 (citing Dkt. #172 at 25:14-26:1).  However, this testimony does not establish that Cassie Holden was not struck on the ground, nor does Mr. Sweeney's conclusory statement in the "synopsis" section of his report that "[n]o evidence of blunt force induced blood spatter is noted at the final resting place.").  See Dkt. #251 at 6.

[20]  See 37 REC 19985 (June 1996 Sweeney Decl.) at ¶30 ("Unfortunately, it is likely that the nature of the stick has changed substantially over the years.  Testing the stick now is not likely to produce information that would be useful for this case.").

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -18-

1   response, Gentry has not submitted any additional evidence that the assault "lasted only

2   seconds."[21]

3       Accordingly, the Court finds that Gentry has not supplemented the state-court record with

4   evidence under Strickland showing the result of Gentry's trial was unreliable, and it is not

5   reasonably probable that the outcome in the guilt or penalty phases of his death penalty case

6   would have been different.[22]   Gentry has not shown that the Washington Supreme Court's

7   decision on habeas Claim B—that his trial counsel failed to investigate and present expert

8   testimony regarding the forensic evidence at the crime scene—was contrary to or an

9   unreasonable application of clearly established federal law, or based on an unreasonable

10  determination of the facts.  Therefore, the Court grants respondent's motion for summary

11  judgment and denies Claim B of Gentry's Amended Petition.

12      **(c)**    **Investigation and expert testimony regarding the number of fatal blows**

13      Respondent moves for summary judgment on Gentry's IAC habeas claim that his trial

14  counsel were ineffective because they failed to investigate and rebut the State's contention that

15  the assailant struck the victim with more than one fatal blow.  See Dkt. #47 ("Claim C") at

16  ¶¶14.4; 61-79; Dkt. #272.  In Claim C, Gentry contends that "[e]ffective counsel would have

17  presented the testimony of a qualified expert such as Dr. James A. Newman" who "would have

18  testified that the victim's two major head injuries are located on opposite sides of the skull, and

19

20      [21]  See Dkt. #275 at 6 (citing Myster Dep. at 27); Dkt. #172 (Myster Dep.) at 27:11-16 ("Q.  This

21  could have been—these injuries could have been inflicted within ten to 12 seconds, these eight to ten
    blows?  A.  I don't—I don't know.  Q.  Okay.  A.  I would—I would think a little longer than that.").

22      [22] See Raley v. Ylst, 470 F.3d 792, 802 (9th Cir. 2006) ("[I]n order to prevail on a claim of

23  prejudice, Petitioner must demonstrate that counsels' failure to call expert witnesses rendered the results
    of his trial unreliable or fundamentally unfair.  The bar for establishing prejudice is set lower in death-
24  penalty sentencing cases than in guilt-phase challenges in noncapital cases.  Even in the context of a
    challenge to a death sentence, however, Petitioner must show that it is reasonably probable that the
25  outcome would have been different had counsel performed adequately.") (internal citations omitted), cert.

26  denied sub nom. Raley v. Ayres, 128 S. Ct. 59 (2007).

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION    -19-

1    that these injuries are consistent with both being caused at the same time by one blow to the

2    victim's temple while the back of the victim's head was against a hard object like a tree—such

3    as the maple tree at the crime scene, which tested positive for blood when subjected to luminol

4    testing."  Dkt. #47 at ¶¶74; 77.

5         The Washington Supreme Court considered this claim, Claim C, along with Gentry's

6    other IAC claim, including Claim B regarding the crime scene evidence.  As with Claim B, the

7    Washington Supreme Court correctly used Strickland's two-part test as the controlling standard,

8    and as a result the decision was not "contrary to" Strickland, and Gentry is entitled to habeas

9    relief only if In re Gentry involved an "unreasonable application" of Strickland or if it "was

10   based on an unreasonable determination of the facts in light of the evidence presented in the

11   State court proceeding."  28 U.S.C. § 2254(d)(1); (2).  The Washington Supreme Court also

12   dismissed Claim C for the same reason it dismissed Claim B—in the face of other evidence at

13   trial, Gentry's counsel's failure to present the testimony of a biokinetics expert like Mr.

14   Newman did not deprive Gentry of a fair trial.  In making this determination, the Court

15   considered additional material submitted with Gentry's Amended PRP, including a declaration

16   from Mr. Newman.

17        In his declaration, Mr. Newman states that "[h]ad I been retained by trial counsel in this

18   case, I would have visited the crime scene, inspected the rock, analyzed all photographs showing

19   the victim's injuries, analyzed the x-rays taken at the autopsy, and interviewed Dr. Myster or

20   instructed counsel regarding the questions to ask him."  37 REC 19961 at ¶13 (Newman Decl.).

21   As previously discussed, Gentry's trial counsel retained the assistance of Dr. Reay as an expert

22   to support Gentry's theory of the case, and Dr. Reay performed the functions Mr. Newman

23   stated that he would provide the defense.[23]  However, unlike Mr. Newman who prolifically

24

25        [23]  Dr. Reay testifed that as an experienced medical examiner, a review of the crime scene
26   photographs and a review of the autopsy report was sufficient in order for him to testify.  See 17 REC

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28   DENYING AMENDED HABEAS PETITION            -20-

testifies primarily as a helmet expert,[24] Dr. Reay is not only a doctor but an esteemed medical examiner,[25] who at the time of trial, had personally performed over 4,500 autopsies and was responsible for about 1,000 autopsies per year in King County. See 17 REC 9168. Significantly for the circumstances of Gentry's case, Dr. Reay testified that he had performed approximately 200 autopsies on victims who had died as a result of blunt head drama, and on-site investigation of at least 100 wooded-area crime scenes. Id. at 9168-69; 9174. In preparation for trial, Gentry's counsel met with Dr. Reay to discuss the autopsy four months before Dr. Myster testified for the State. See 39 REC 20833 (Fee request log). As respondent notes in his answer, Gentry's retention of Dr. Reay presumptively assisted with Gentry's counsel's cross-examination of Dr. Myster, which established, among other things, that: Dr. Reay is a competent and professional medical examiner;[26] Dr. Myster could not establish that Cassie Holden was killed at her final resting place;[27] Dr. Myster could not testify about the position of Cassie Holden's body when she was struck in the head;[28] and subarachnoid hemorrhaging can be

9212:9-14.

[24] See 37 REC 19959 at ¶2 ("I have testified in court over 300 times—primarily in products liability cases where head injuries are involved."); see, e.g., Mize v. HJC Corp., 2006 U.S. Dist. LEXIS 65180, at *16 (N.D. Ga. Sept. 13, 2006) (functioning as defendant's expert in helmet design defect case); Taggert v. Super Seer Corp., 40 Cal. Rptr. 2d 56, 60 (Cal. Ct. App. 1995) (same).

[25] See, e.g., State v. Jones, 59 Wn. App. 744, 750 (1990) (finding that Dr. Reay is "eminently qualified to analyze the physical evidence and formulate opinions as to the cause of death."); Peirce v. United States, 2007 U.S. Dist. LEXIS 39043, at *7 (W.D. Wash. May 30, 2007) ("The Court finds Dr. Reay to be a qualified and credible expert witness.").

[26] See 14 REC 7375:5-8.

[27] See 14 REC 7376:16-19 ("Q. Now, you're not telling the jury that Cassie Holden was killed in the spot where she was lying, you're not saying that, are you? A. [Dr. Myster] No.").

[28] See 14 REC 7388:24-7389:4 ("Q. [B]ased on all of your review of the evidence in this case, you don't know if Cassie Holden was standing up, sitting down, or laying down when the blows to her head were struck, isn't that fair to say? A. [Dr. Myster] Yes, I think that's fair to say.").

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION             -21-

1  caused by a contrecoup injury.[29]  Furthermore, in support of Gentry's one-fatal-blow theory, on

2  direct, Dr. Reay also testified that the victim's pattern of lividity did not eliminate the potential

3  that she was killed twenty-five yards from her final resting place,[30] and that the "raccooning" of

4  her eyes could have been caused by one blow, not two.[31]

5       In light of all the evidence presented at trial regarding when and where the fatal blow was

6  struck, the Washington Supreme Court concluded that the outcome of the trial would not have

7  been different even with the testimony of Mr. Newman based on a reasonable determination that

8  the evidence at trial showed Cassie was struck between eight and fifteen times with a two-pound

9  rock, including one blow to the forehead through her sweatshirt, with sufficient force to cause a

10 fatal injury.

11      Beyond the state-court record, the only additional evidence that Gentry submits in

12 support of this IAC claim is Dr. Myster's December 2005 deposition testimony.  See Dkt. #275

13 at 6 (citing Myster Dep. at 19; 21-22).   The Court finds, however, that in his deposition Dr.

14 Myster did not testify that there was a reasonable probability that the fatal head injuries were

---

17  [29] See 14 REC 7388:7-9.  This testimony was elicited to support Gentry's theory that the two
18 fatal injuries could have been the result of one fatal blow.

19  [30] See 17 REC 9181:22-9182-3 ("Q. [I]f the blows which caused Cassie Holden's death were
20 struck here (indicating), and if her body was moved to this location (indicating) within five minutes,
   would the lividity patterns, as shown in the crime scene photographs be consistent with that scenario?  A.
21 [Dr. Reay] Oh yes, very much so.").

22  [31] See 17 REC 9170:19-9171:6 ("Q.  Doctor, do you have an opinion to a reasonable degree of
23 medical certainty about whether or not the black eyes or 'Raccooning of the eyes' that you see in those
   pictures, were those results necessarily cause[d] by two separate blows, one to the right eye and one to
24 the left eye, in order to get that sort of Raccooning to the eyes?  A. [Dr. Reay] No, this type of
   hemorrhaging will just result as a result of fracturing of the base of the skull.  The skull behind the eye
25 can cause bleeding into the outer tissues of the eye.  So it doesn't necessarily represent a separate impact
26 about the eye to produce the injury.").

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION          -22-

caused by one blow, he simply agreed in response to a leading question that it was <u>possible</u>.[32] And, significantly, this testimony must be considered with Dr. Myster's confirmation of the autopsy report when it said "there were ten major blunt trauma blows to the head." <u>Id.</u> at 10:3-6.

As with Gentry's previous IAC claim, the Court finds that Gentry has not supplemented the state-court record with evidence under <u>Strickland</u> showing the result of Gentry's trial was unreliable, and it is not reasonably probable that the outcome of the trial would have been different.  Gentry has not shown that the Washington Supreme Court's decision on his habeas Claim C—that his trial counsel failed to present testimony from a biokineticist expert like Mr. Newman regarding the number and location of fatal blows—was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts.  Therefore, the Court grants respondent's motion for summary judgment and denies Claim C of Gentry's Amended Petition.

### (d)     DNA and serological test results

Respondent moves for summary judgment on Gentry's IAC habeas claim ("Claim D") that his trial counsel failed to investigate and present expert testimony to rebut the State's evidence that there was a statistical valid probability that the DNA analysis and serological results linked Gentry to the crime.  <u>See</u> Dkt. #47 ("Claim D") at ¶¶14.5; 80-111; Dkt. #272. Gentry opposes summary judgment.  Gentry's response, however, highlights the challenge of applying the procedural vehicle of summary judgment to this habeas proceeding.  On the one hand, Gentry contends that summary judgment is inappropriate given his assertion that there are disputed material factual issues on Claim D.  Gentry, however, simply references his Amended PRP and accompanying exhibits as the basis for the alleged factual disputes.  <u>See</u> Dkt. #275 at 9

---

[32]  <u>See</u> Dkt. #172 (Myster Dep.) at 19:7-10 ("Q.  Now, it's possible, isn't it, that one impact to the head could have caused more than one of the injuries you saw.  A. [Dr. Myster] Yes.").

1    (citing 37 RP 19675-6; 19993-9 (Zabell Decl.)).[33]  On the other hand, Gentry has previously

2    conceded that an evidentiary hearing is not needed under Habeas Corpus Rule 8 and has

3    submitted no additional evidence, by way of declaration or otherwise, with his opposition to

4    respondent's summary judgment motion.[34]  By failing to include any additional evidence or to

5    move for a hearing, Gentry implicitly concedes that the evidence in the record is sufficient for

6    the Court to decide this claim, and the Court concludes based on its independent review of the

7    record that no supplementation is necessary.  Accordingly, respondent's summary judgment

8    motion is properly before the Court for consideration.  See 1 Randy Hertz & James S. Liebman,

9    Federal Habeas Corpus Practice and Procedure § 17.3, at 827 (5th ed. 2005) ("Summary

10   judgment motions also may be premised on the factual record made by the parties in prior state-

11   court proceedings (whether or not there are favorable state-court factfindings) or on facts

12   developed in the habeas corpus proceeding itself through discovery, expansion of the record, or

13   the petitioner's investigation as reflected in affidavits appended to the motion.").

14        In adjudicating Gentry's Claim D, the Washington Supreme Court correctly used

15   Strickland's two-part test as the controlling standard.  Therefore, the decision was not "contrary

16   to" Strickland, and Gentry is entitled to habeas relief only if In re Gentry involved an

17   "unreasonable application" of Strickland or if it "was based on an unreasonable determination of

18   the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

19   2254(d)(1); (2).  The Washington Supreme Court rejected Claim D, stating:

20

21        [33]  In his opposition, Gentry also makes a passing reference to Claim I, which the Court addresses

22   in Section II.2.D(i), below.  See Dkt. #275 at 9 n.4.

23        [34]  In his motion for an evidentiary hearing on his IAC claims, Gentry conceded that a hearing was

24   not required for his claim concerning the DNA analysis and serological results.  See Dkt. #204 n.2 (citing

     Dkt. #47 (Amended Petition) at ¶¶14.5).  Although at oral argument Gentry's counsel recanted ths

25   position, Gentry has failed to establish the need for a hearing on Claim D and the request is therefore

26   denied.

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28   DENYING AMENDED HABEAS PETITION          -24-

Gentry's trial counsel retained several experts who testified the type of tests the State performed are not accepted in the scientific community, and the State's witnesses' conclusions were flawed. Gentry is now claiming they should also have presented expert testimony disputing the State's expert's calculations of the numerical "match" between Cassie's blood and the blood on Gentry's shoe, and between the "Negroid" hair on her body and Edward Gentry's hair. The State's experts testified the blood type on the shoe matched that of about .25 percent of the Caucasian population (including Cassie), and the DNA on the hair matched 6 percent of the black population (including Edward Gentry).

According to Sandy Zabel [sic], the expert located by Gentry's current attorneys, the proper comparison for the blood is with the entire population, not just Caucasians. By her calculations, the DNA on the shoe matched about 1.8 percent of the entire population (1 in 55). That is still a closer match than the hair to Edward Gentry, and very damaging to Gentry.

With respect to the hair, Zabel [sic] says the jury should have been told there was about a 45 percent chance either Edward or Jonathan Gentry would match at least one of the two hairs found on Cassie's body. That conclusion seems to be premised on a theoretical comparison of two random persons to two unknown hairs, rather than to the facts of this case. One of the hairs on Cassie's body was from a Caucasian person. Thus, as the jury was told, it could not have come from either Gentry brother. The DNA testing also excluded Jonathan Gentry as the source of the Negroid hair, again as the jury was told. Thus, whatever the theoretical odds of either Gentry brother matching two unidentified hairs, there was in fact zero percent chance that either man was the source of the Caucasian hair or Jonathan Gentry was a source of the Negroid hair. The only relevant remaining question was whether Edward Gentry could have been the source of the Negroid hair. It was not misleading to tell the jury that the DNA in that hair matched that of Edward and 6 percent of the black population. Gentry's trial counsel made no errors here.

In re Gentry, 137 Wn.2d at 402-403. As this quoted passage above explains, the focus of the Washington Supreme Court's analysis was Strickland's "prejudice" inquiry. However, as with Gentry's other IAC claims, the Washington Supreme Court ultimately concluded that Gentry's claim failed both parts of Strickland's two-part test.[35] This ruling on both parts of the Strickland inquiry is entitled to deference under the AEDPA because it constitutes a decision on the merits of the federal claim. See Pinholster, 525 F.3d at 756 ("Deference to state court decisions applies only to claims the state court adjudicated on the merits); 756 n.11 ("The

---

[35] In re Gentry, 137 Wn.2d at 404 ("In summary, Gentry's trial counsel were not deficient in failing to consult additional experts to a degree that deprived Gentry of a fair trial.") (emphasis added).

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -25-

1   California Supreme Court's denial of a habeas petition without comment or citation constitutes a

2   decision on the merits of the federal claims."); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir.

3   2002) ("When the Washington Supreme Court here actually passed on the merits, it took its

4   opportunity to address the federal claim.").  As discussed below, the first part of Strickland's

5   test, the "deficient performance inquiry," is dispositive here and therefore the Court does not

6   need to reach the question of whether the Washington Supreme Court's ruling that there was no

7   prejudice involved an unreasonable application of clearly established law under § 2254.

8   Strickland, 466 U.S. at 697.

9           Pursuant to Strickland's first element, Gentry specifically identified the acts or omissions

10  of counsel that are alleged not to have been the result of reasonable professional judgment as:

11  the "fail[ure] to consult with or retain an expert statistician to rebut an essential aspect of the

12  State's DNA and serological evidence" given that the State's statistical "figures were prejudicial

13  because they essentially overestimated the likelihood that Cassie Holden's blood was on

14  Jonathan Gentry's shoes and the likelihood that his brother's hair was on her body."  Dkt. #47 at

15  ¶¶105; 109.  Gentry contends that his counsel was ineffective because they failed to contest the

16  statistical results of the DNA and serological tests, specifically the testimony of Dr. Edward

17  Blake that the bloodstains on Gentry's shoelaces match only 0.18% of the Caucasian population

18  and the hair matches only 6% of the African American population.  See Dkt. #47 at ¶¶103, 108;

19  17 REC 9311-9315 (Dr. Blake testimony).  Gentry concedes that his lawyers "confronted the

20  substantive reliability of the State's DNA and serological testing" but nevertheless contends that

21  "they had no strategy or evidence to confront the implications of this evidence if the jury found

22  the State's testing was reliable."  Dkt. #47 at ¶110.  Gentry essentially asserts that his counsel

23  was deficient for failing to adopt the following two-tiered defense:  first, present evidence to the

24  jury that the science and testing of the State's DNA and serological evidence was unreliable; and

25  second, present expert testimony contending that even if the scientific testing was reliable, the

26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION          -26-

statistical <u>results</u> were erroneous.  The Court, however, concludes that Gentry's counsel reasonably chose the strategy of attacking the reliability of the State's science and testing evidence without disputing the results, given the substantial gamble of arguing alternative and incongruent theories to a jury in a capital case and risking that the jury might reject the merit of both theories.

Under <u>Strickland</u>, the Court must presume that counsel was competent and Gentry "must rebut this presumption by showing that his [counsel's] performance was objectively unreasonable under prevailing professional norms and was not the product of sound strategy." <u>Duncan v. Ornoski</u>, 528 F.3d 1222, 1234 (9th Cir. 2008) (citing <u>Strickland</u>, 466 U.S. at 688-89). The Court's scrutiny of Gentry's counsel "must be highly deferential" and should make every effort "to eliminate the distorting effects of hindsight."  <u>Strickland</u>, 466 U.S. at 689; <u>see</u> <u>Rompilla v. Beard</u>, 545 U.S. 374, 381 (2005) ("[I]n applying <u>Strickland</u> generally, hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made and by giving a heavy measure of deference to counsel's judgments.") (internal quotation marks and citation omitted).

Although the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" the Ninth Circuit has established "general principles" that guide the determination of what constitutes objectively reasonable attorney performance, including the duty to investigate.  <u>Wiggins v.</u> <u>Smith</u>, 539 U.S. 510, 521 (2003) (quoting <u>Strickland</u>, 466 U.S. at 688); <u>Duncan</u>, 528 F.3d at 1234.

The Ninth Circuit "allow[s] lawyers considerable discretion to make strategic decisions about what to investigate, but only after those lawyers 'have gathered sufficient evidence upon which to base their tactical choices.'"  <u>Duncan</u>, 528 F.3d at 1235 (quoting <u>Jennings v.</u>

Woodford, 290 F.3d 1006, 1014 (9th Cir. 2002) (emphasis omitted).  "[O]nce counsel

reasonably elects to pursue one defense theory, 'the need for further investigation [of the other

theory] may be considerably diminished or eliminated altogether.'"  Turk v. White, 116 F.3d

1264, 1267 (9th Cir. 1997) (alteration in original) (quoting Strickland, 466 U.S. at 691).  "When

the selected defense is incompatible with the defense that defense counsel chose not to

investigate or pursue, this principle is quite compelling."  Franklin v. Johnson, 290 F.3d 1223,

1236 (9th Cir. 2002).  These principles from the Ninth Circuit are consistent with the Supreme

Court's pronouncement in Strickland that "strategic choices made after thorough investigation of

law and facts relevant to plausible options are virtually unchallengeable."  466 U.S. at 690.

    In Gentry's case, counsel's decision at trial to contest the reliability of the scientific

testing, rather than statistical results, was based on extensive evidence developed before trial.

The pretrial proceedings in this case included a Frye v. United States, 293 F. 1013, 1014 (D.C.

Cir. 1923), hearing on the admissibility of the DNA and serologic evidence that spanned six

weeks,[36] and included testimony from eight witnesses for the State, six defense expert witnesses,

and 101 exhibits.  See 2 REC 648-656.   The theme counsel advanced during trial was the theme

developed from the Frye-proceeding:

> The approach that is being advocated by the defense, Your Honor, is simply stated
> as follows:  If we are getting to the point in the criminal law where science is
> going to determine the guilt or innocence of the accused, then we damn well better
> make sure that we practice science and not pseudo-science.  In other words, we'd
> better make sure that the rigors of the scientific tradition are applied to the analysis
> of crime scene evidence.

7 REC 3662:9-17 (Frye-hearing defense closing).  At trial, Gentry's counsel consistently

presented the theme through expert testimony that none of the DNA or serological analyses was

reliable enough to do any calculations.  For example, during the concluding direct-examination

questions of defense expert Dr. Benjamin Grunbaum, counsel elicited the following:

---

[36]  See State v. Gentry, 125 Wn.2d at 581.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION            -28-

> Q.  Doctor, I'd like to now show you what has been admitted into evidence as State's Exhibit 82[37]. . . .  There has been previous testimony, Doctor, that—which is summarized by this chart with respect to conclusions that were drawn by other witnesses with respect to the analysis of the types of the left shoelace, and the right shoelace, Cassie Holden, and the percentage of the population that has those particular types.  And then on the far right there's a column that is said to pertain to Jonathan Gentry.  If the ABO type on the left and right shoelaces is a type A, would that exclude Cassie Holden as the donor of the blood on the shoelaces?
>
> A.  Correct, Yes, it would.
>
> Q.  And so I take it we could then eliminate 44.5 percent as is shown up here; is that right?
>
> A.  That's correct.  It wouldn't belong there.
>
>                                  . . .
>
> Q.  I want you to assume that there's evidence that this gamma marker test is scientifically unreliable.  Would you then disregard the 14 percent?
>
> A.  Definitely.
>
> Q.  I want you to look now at the haptoglobin.  And if no call can be made on the left shoelace and the right shoelace, would that essentially throw out the 36.1 percent figure?
>
> A.  It would.
>
> Q.  And I want you to assume hypothetically that the results that are reported here with respect to the PCR examination are also not valid.  Would that remove the 8 percent figure?
>
> A.  It would.
>
> Q.  One final question, Doctor.  What is zero times zero times zero times zero times zero in a PGM?
>
> [Objection sustained].

17 REC 9681:8-9683:3 (emphasis added).  This theme continued during counsel's final direct-examination questions of Gentry's expert David Adler:

> Q.  I'd like you to assume that there has been testimony that the gamma marker test in this case was done with an unreliable method.  I'd also like you to assume that there has been testimony in this case that the haptoglobin test does not indicate a type two on the left shoelace, which could be consistent with Cassie Holden, but is either uninterpretable, or indicative of another haptoglobin variant, having all that in mind in a hypothetical, can you indicate whether or not you would feel that it would be appropriate to use haptoglobin results, gamma marker results, an ABO result in the use of a product rule to try to determine what

---

[37]  Significantly, the results from State's Exhibit 82 are the statistics that Gentry contends that his counsel should have challenged through testimony from an expert statistician.  See 17 REC 9311-9315 (Dr. Blake's direct-examination testimony, referring to Exhibit 82, explaining based on the product rule that the blood on the shoelaces would match only .18% of the Caucasian population and the hair would match only 6% of the black population); 37 REC 19995-19999 (Zabell Decl.) (contesting these statistics).

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION                -29-

percentage of the population might have all of those genetic markers in common?
A.  I would not do that.
Q.  Can you tell the jury why?
A.  Well, I think it speaks to the reliability of each particular technique.  If you're multiplying numbers together and your multiplying numbers that are the results of unreliable tests, then what you're doing really is multiplying your error and that's a problem.

18 REC 9860:5-24 (emphasis added).  Finally, defense counsel's theme that the science was not

reliable, and therefore the jury should not consider the results, was the focus of Gentry's guilt-

phase closing argument conclusion:

The last area I want to talk to you about is the science.  And it is in this area that the presentation of this case is the most frightening, because the state has basically asked you to abandon your duty as jurors in the critical examination of this evidence.  Just take it on the word of our experts.  They came in and told you that this is what the types were, this is what the results were.  Don't worry about it any further than that.

Folks, you go back there please, and have this discussion.  Ask yourselves, who took the time to try and explain the scientific evidence to you?  Who took the time to go beyond the conclusions and to get into the scientific basis for those examinations?  And I suggest to you, it was the defense, it was us.  Because the state is not interested in you understanding this science.  They just want you to accept the results.

18 REC 10196:16-10197:7 (emphasis added); see also 18 REC 10200:4-7 ("What they [the

State] want to do is transfer the technology and forget everything about the scientific rigor that

insures that these test results are reliable.");17 REC 10217:6-9 ("The state tries to pick and

choose about what rules of scientific method are going to be followed in what given test,

depending on the test results, and that's just not fair.").

As these specific examples show, throughout the trial, Gentry's counsel drummed the

theme that the State's scientific theory and testing were unreliable.  Based on a review of the

entire trial court record, the Court has no doubt that the decision to contest the reliability of the

DNA and serologic science and tests was a strategic choice made after a thorough investigation

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION            -30-

of law and facts, and not the product of counsel's oversight.[38]  Counsel cannot be faulted for not

flipping 180-degrees and softening this theme by asking an expert like Dr. Zabell to assume the

science was reliable and simply contest the statistical accuracy of the results.[39]

For all the foregoing reasons, Gentry has not shown that the Washington Supreme

---

[38]  Gentry's counsel's declaration submitted with the PRP states:  "I have recently reviewed the Declaration of Dr. Sandy Zabell.  Based upon the Declaration of Dr. Zabell, I now realize that I should have challenged the use of statistics by the State.  Had I obtained a preliminary opinion such as contained in the Declaration of Sandy Zabell, I would have hired that statistician and prepared him to testify at trial."  37 REC 19676 (Robinson Decl.) at ¶45; 37 REC 19689 (Leatherman Decl.) at ¶43 (same).  It is clear under Strickland that the Court must "evaluate the conduct from counsel's perspective at the time."  466 U.S. at 689.  Therefore, Gentry's counsel's current regret about their performance formed after a post-conviction review of a preliminary expert declaration secured by appellate counsel, does not support a claim that trial counsel performed deficiently at the time of trial.
    The Court also recognizes that it is not uncommon for defense counsel in a capital case to concede in a post-conviction proceeding that their trial performance was deficient.  See Kyle Graham, Tactical Ineffective Assistance in Capital Trials, 57 Am. U.L. Rev. 1645, 1675 n.171 (2008) (noting that "attorneys often candidly admit that they rendered ineffective assistance in capital cases") (citing Walls v. Bowersox, 151 F.3d 827, 836 (8th Cir. 1998); Commonwealth v. Carson, 913 A.2d 220, 265 (Pa. 2006), cert. denied, 128 S. Ct. 384 (2007)).  The Court here is not suggesting that Gentry's trial counsel's admitted failures were in any sense "tactical" at trial.  But, as other Courts facing this issue have emphasized, given the understandable desire to protect a former client, a concession by trial counsel in a post-conviction proceeding is not conclusive for purposes of the Sixth Amendment.  See Walls, 151 F.3d at 836 ("The district court found 'the most telling' evidence of ineffectiveness to be counsel's own affidavit which states that he believes he provided Walls with ineffective assistance of counsel.  However, the admissions of inadequate performance by trial lawyers are not decisive in ineffective assistance claims.  See Harris v. Dugger, 874 F.2d 756, 761 n.4 (11th Cir. 1989).  Ineffective assistance is a question for the courts, not counsel, to decide.").
    Finally, at oral argument, Gentry's habeas counsel correctly acknowledged that Jeff Robinson is widely regarded by both the bench and bar as one of best criminal defense attorneys practicing in the State of Washington.  See, e.g., http://www.actl.com (listing Jeff Robinson as a member of the American College of Trial Lawyers, whose membership is limited to 1% or less of lawyers practicing in the state).

[39]  Given Dr. Zabell's equivocal language in her declaration describing her confidence in her statistical analysis, Gentry's counsel's decision to contest only the reliability of the tests, rather than to contest both the reliability and the results, appears even more reasonable.  See 37 REC 19994 (Zabell Decl.) at ¶7 ("For the reasons stated in the attached memorandum, it is my preliminary opinion that the use of statistical evidence in this case was possibly misleading.") (emphasis added).  The Court also finds that the State effectively rebutted Dr. Zabell's opinions through the persuasive declaration from Dr. Richard Gelinas submitted in opposition to Gentry's Amended PRP.  See REC 39 at 20983-20995.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -31-

1    Court's decision that Gentry's trial counsel were not deficient in failing to consult additional

2    experts under <u>Strickland</u> was contrary to, or an unreasonable application of, clearly established

3    federal law, or based on an unreasonable determination of the facts.[40]  Therefore, the Court

4    grants respondent's motion for summary judgment and denies Claim D of Gentry's Amended

5    Petition.

6              **(e)**    **<u>Brady</u> violations**

7              Respondent moves for summary judgment on Gentry's claim that the State violated <u>Brady</u>

8    <u>v. Maryland</u>, 373 U.S. 83 (1963), by failing to disclose impeachment evidence about the three

9    jailhouse witnesses and two detectives.  <u>See</u> Dkt. #47 ("Claim E") at ¶¶12; 112-222; Dkt. #272.

10   In the Court's "Order on Petition for Habeas Relief Based on <u>Brady</u> and <u>Napue</u> Violations"

11   (Dkt. #283) and the "Order on <u>Brady/Napue</u> Claims Regarding Leonard Smith" (Dkt. #284), the

12   Court denied Gentry's Claim E with respect to all of his <u>Brady</u> violation claims for jailhouse

13   witnesses Brian Dyste, Timothy Hicks, Leonard Smith, and Detectives Doug Wright and Smed

14   Wagner.  Based on these orders, respondent has already prevailed on this claim.  Therefore, the

15   Court grants respondent's motion for summary judgment and denies Claim E of Gentry's

16   Amended Petition.

17             **(f)**    **<u>Napue</u> violations**

18             Respondent moves for summary judgment on Gentry's claim that the State violated

19   <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), by presenting false testimony from the three jailhouse

20   witnesses.  <u>See</u> Dkt. #47 ("Claim F") at ¶¶13; 223-225; Dkt. #272.  In the Court's "Order on

21

22             [40]  It should also not be forgotten that at the time of Gentry's trial, the use of forensic DNA

23   evidence was very much cutting edge.  The Washington Supreme Court's <u>State v. Gentry</u> decision
     remains one of the early and leading cases on the admissibility of "inclusionary" DNA evidence.  <u>See,</u>

24   <u>e.g.</u>, National Research Counsel, <u>The Evaluation of Forensic DNA Evidence</u> 209 (1996) ("NRC II")
     (identifying <u>State v. Gentry</u> as a leading case).  Therefore, Gentry's counsel's reasonable strategy to

25   contest the reliability of the science in 1991 as opposed to the results, must be viewed against this
     historical backdrop and not with the benefit of 20/20 hindsight today.

26

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S

28   CROSS-MOTION FOR SUMMARY JUDGMENT, AND
     DENYING AMENDED HABEAS PETITION          -32-

Petition for Habeas Relief Based on <u>Brady</u> and <u>Napue</u> Violations" (Dkt. #283) and the "Order

on <u>Brady/Napue</u> Claims Regarding Leonard Smith" (Dkt. #284), the Court denied Gentry's

Claim F with respect to all of his <u>Napue</u> violation claims for jailhouse witnesses Brian Dyste,

Timothy Hicks, Leonard Smith.  Therefore, based on these orders, respondent has already

prevailed on this claim.  Therefore, the Court grants respondent's motion for summary judgment

and denies Claim F of Gentry's Amended Petition.

### (g)    Investigation of impeachment evidence

Next, respondent moves for summary judgment on Gentry's claim that his counsel was

ineffective under the Sixth Amendment for failing to fully investigate the State's three jailhouse

witnesses.  <u>See</u> Dkt. #47 ("Claim G") at ¶¶14.1; 226-232; Dkt. #272.  In considering this

ineffective assistance of counsel claim, the Washington Supreme Court decided under the

second part of the <u>Strickland</u>'s test that "[e]ven if a more thorough investigation [of the jailhouse

witnesses Dyste, Hicks, and Smith] were constitutionally required, the representation Gentry

received did not deprive him of 'a fair trial, a trial whose result is reliable.' <u>Strickland</u>, 466 U.S.

at 687." <u>In re Gentry</u>, 137 Wn.2d at 401.  In two prior orders, the Court denied Gentry's

Amended Petition with respect to all of his <u>Brady</u> and <u>Napue</u> violation claims for jailhouse

witnesses Dyste, Hicks, and Smith, and Detectives Wright and Wagner because the Court

concluded there was no violation of <u>Brady/Napue</u> because the evidence was not "material," and

there was no reasonable probability that the outcome of the trial would have been different if the

impeachment evidence had been disclosed to the jury.  <u>See</u> Dkt. #283 at 16-25.

Gentry's failure to establish that the <u>Brady</u> evidence was material necessarily means that

his ineffective assistance of counsel claim also fails because "[t]he materiality standard under

<u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), is the same as the prejudice standard under

<u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984)—whether 'there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would have

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION              -33-

been different.'"  Clay v. Bowersox, 367 F.3d 993, 1000 (8th Cir. 2004) (citing United States v. Bagley, 473 U.S. 667, 682 (1985), cert. denied sub nom. Clay v. Roper, 544 U.S. 1035 (2005); see also Benn v. Lambert, 283 F.3d 1040, 1053 (9th Cir. 2002) ("[W]e analyze all of the suppressed evidence together [under Brady], using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases."); Jennings v. Crosby, 392 F. Supp. 2d 1312, 1324 (N.D. Fla. 2005) ("Mr. Jennings' failure to demonstrate Brady materiality is fatal to any potential ineffective assistance claim based on failure to discover the evidence."), aff'd sub nom. Jennings v. McDonough, 490 F.3d 1230 (11th Cir. 2007), cert. denied sub nom. Jennings v. McNeil, 128 S. Ct. 1762 (2008).  Gentry's ineffective assistance of counsel claim therefore fails for the same reason his Brady claim fails.  Given the congruence of the Brady materiality and Strickland prejudice standard,[41] and the factual overlap between Gentry's Brady claim and his ineffective assistance of counsel claim based on the jailhouse witnesses, Gentry has not shown that the Washington Supreme Court's decision under Strickland was contrary to, or an unreasonable application of clearly established law.  The Court therefore grants respondent's motion for summary judgment on this claim and dismisses Claim G of the Amended Petition.

This decision, however, is not a complete ruling on Gentry's IAC claim pertaining to the alleged failure to investigate impeachment evidence.  In response to question seven from the Court's "Order on Oral Argument Addressing the Pending Summary Judgment Motions" (Dkt.

_____

[41]  In Joseph v. Coyle, 469 F.3d 441 (6th Cir. 2006), cert. denied sub nom. Houk v. Joseph, 127 S. Ct. 1827 (2007), the Sixth Circuit traced the history behind this congruence.  Id. at 462 n.16 ("This similar wording is, of course, no coincidence.  The Court explicitly acknowledged in Strickland that its 'test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution.'  466 U.S. at 694 (citing United States v. Agurs, 427 U.S. 97, 104, 112-13 (1976)).  A majority of the Court then imported 'the Strickland formulation of the Agurs test for materiality' back into [the] Brady doctrine.  United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J., joined by O'Connor, J.); see also id. at 685 (White, J., joined by Burger, C.J., and Rehnquist, J., concurring in part and concurring in the judgment) (agreeing with the standard).").

#282), at oral argument on September 8, 2008, Gentry's counsel asserted that the IAC claim pertaining to Detective Douglas Wright as alleged in paragraph 14.2 of the Amended Petition had not yet been addressed by the Court.  Paragraph 14.2 claims that "[t]rial counsel were ineffective because they failed to investigate lead detective Douglas Wright, and therefore failed to uncover a material history of misconduct, including lying under oath, engaging in illegal searches and other misconduct, which should have been used to impeach Detective Wright."  Dkt. #47 at 3.

During the evidentiary hearing in March of 2006, Gentry was granted wide latitude to present evidence concerning the alleged impeachment evidence.  See Dkt. #156 at 4 (framing an issue for the hearing:  "Did the State violate Brady and Napue by failing to disclose evidence relating to Timothy Hicks, Brian Dyste, Detective Wright, or Detective Wagner?").  To support his allegations regarding Detective Wright, on March 7, 2006, Gentry presented testimony from Douglas Hudson, who had worked as a detective with Detective Wright at the Kitsap County Sheriff's Office and worked with Detective Wright during the Gentry investigation.  See Dkt. #254 at 213; 216.  At the evidentiary hearing, Gentry's counsel essentially used Detective Hudson's testimony to confirm allegations he had made against Detective Wright in a July 18, 1997 declaration and during a deposition in a civil case.  See EH Exs. 131 (Hudson Decl.); 132 (deposition transcript); see, e.g., Dkt. #254 at 213:17-19 ("Are the claims that you make in here [EH Ex. 131] with respect to Detective Wright, are they truthful?  Is that the truth of what happened?); 214.  The Court finds, however, that Gentry failed to present credible evidence concerning Detective Wright's purported misconduct.  Under the factors set forth in Ninth Circuit Model Jury Instruction 1.11, the Court did not find Mr. Hudson's evidentiary hearing testimony credible.  First, Mr. Hudson conceded on cross examination and re-direct that the allegations concerning Detective Wright, with the exception of court-ordered recognizance allegations and an alleged illegal search of a garage, were based on hearsay.  See Dkt. #254 at

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION            -35-

215; 218-19.   Second, and most importantly, on cross examination Mr. Hudson acknowledged his bias against Detective Wright by testifying that Detective Wright was one of the reasons Mr. Hudson was no longer employed with the Kitsap County Sheriff's Office.  Id. at 215:21-216:3. Based on the Court's finding that Gentry failed to present the existence of credible impeachment evidence against Detective Wright, there was no failure to disclose "'evidence favorable to an accused,'" and therefore there is no corresponding colorable IAC claim for failure to investigate this evidence.  See Bagley, 473 U.S. at 676 (quoting Brady, 373 U.S. at 87).  As a result, the Court denies Gentry's IAC claim as alleged in paragraph 14.2 of the Amended Petition.

### (h)    Mitigating evidence

Respondent moves for summary judgment on Gentry's claim that his counsel were ineffective for failing to present mitigating evidence in the penalty phase regarding Gentry's mental condition.  Dkt. #47 ("Claim H") at ¶¶14.6; 246-302; Dkt. #272.  In his response, Gentry contends that "[t]his Court has ruled this claim unexhausted, Dkt. No. 89, and it is therefore not properly before the Court for summary judgment.  Mr. Gentry concludes the inclusion of this claim in Respondent's motion was simply an oversight."  Dkt. #275 at 3 n.1.  While Gentry is correct that the Court previously ruled that "the only ineffective assistance of counsel claim unexhausted is trial counsel's failure to present mitigating evidence of petitioner's mental condition at the penalty phase," Dkt. #89 at 2, the Court subsequently found that "Gentry has failed to establish cause for his default of the claims of ineffective assistance of counsel for failure to present mitigating evidence of his mental condition in the penalty phase."  Dkt. #141 at 14 (Order Regarding Cause and Prejudice).  The Court therefore dismissed this claim "for failure to establish cause for default."  Id.

In response to question three from the Court's August 29, 2008 "Order on Oral Argument Addressing the Pending Summary Judgment Motions," (Dkt. #282), Gentry's counsel conceded at oral argument that Claim H is moot given the Court's prior rulings.  Accordingly, based on

1  this concession and because respondent has already prevailed on this claim, respondent's motion

2  for summary judgment is granted and Claim H of Gentry's Amended Petition is denied.  See

3  Franklin, 290 F.3d at 1231 ("When a petitioner's claims are procedurally barred and a petitioner

4  cannot show cause and prejudice for the default, however, the district court dismisses the

5  petition because the petitioner has no further recourse in state court."); see also Coleman v.

6  Thompson, 501 U.S. 722, 735 n.1 (1991).

7                    **(i)      Admission of unredacted judgment and sentence**

8            Respondent moves for summary judgment on Gentry's claim that his trial counsel failed

9  to move for the redaction of the first degree rape judgment and sentence admitted into evidence

10  at the special sentencing proceeding.  See Dkt. #47 ("Claim I") at ¶¶14.7; 310-312; Dkt. #272.

11  As a threshold matter, based on the Court's prior rulings, the Court rejects respondent's

12  argument that this claim is not exhausted.  See Dkt. #272 at 7; Dkt. #79 at 11-12 ("[T]he Court

13  finds that the following claims presented in Gentry's petition for a writ of habeas corpus were

14  exhausted in the state court system: . . . (3) the claim regarding the admission of petitioner's

15  previous conviction[.]"); Dkt. #89 at 2 ("[A]ll other claims in the Amended Petition for Habeas

16  Corpus are exhausted.").  Additionally, in their briefing on Claim I, the parties dispute the

17  constitutional character of this claim.[42]  The Court defers to the latest filing from Gentry

18  regarding this issue, which asserts that the essence of Claim I is the Sixth Amendment IAC

19  claim.  See, e.g., Dkt. #275 at 10 ("Mr Gentry's claim is that trial counsel were ineffective[.]").[43]

20  _____

21       [42]  See, e.g., Dkt. #277 at 6 ("Moreover, it should be noted that parts of Claim I and J are not

22  even ineffective assistance of counsel allegations.  Claim I was actually a challenge to the admission of the
     unredacted 1988 rape judgment and sentence, and it contains several factual assertions that pertain to an

23  Eighth Amendment-based evidentiary claim, not just ineffective assistance. . . .  Mr. Gentry does not
     oppose Respondent's summary judgment motion with regard to the non-IAC aspects of Claims I and J.").

24

25       [43]  At oral argument, Gentry's counsel asserted that the non-IAC parts of Claim I are still at issue

26  in the case.  See, e.g., Dkt. #47 at ¶¶16; 17 (alleging that admission of the unredacted judgment and

27  ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28  DENYING AMENDED HABEAS PETITION          -37-

Claim I has two parts.  First, Gentry contends that his counsel were ineffective by failing to seek redaction of the rape judgment and sentence.  See Dkt. #275 at 10.  Second, Gentry contends that his counsel were ineffective by proposing a mitigating instruction regarding his future dangerousness.  Id. at 10 ("Trial counsel had no tactical reason to propose a jury instruction about future dangerousness and not oppose use of such an instruction.").  The Court turns now to background of Claim I before considering its merits.

During the penalty phase of the trial, the prosecuting attorney read the judgments and sentences of Gentry's prior criminal convictions to the jury.  See 19 REC 10367-10384.  Penalty phase Exhibit 3, a certified copy of the judgment and sentence relating to a 1988 conviction for rape in the first degree, included the information that:  (1) Gentry had committed rape in the first degree; (2) the maximum term for that crime was life imprisonment; (3) the presumptive sentencing range was 96 to 120 months; (4) there existed substantial and compelling reasons justifying an exceptional sentence of twenty years; and (5) Gentry was ordered to pay certain court costs.  Id. at 10379-10382.  The significance of this exhibit here, is that the judgment and sentence was signed by the Honorable Terence Hanley, the trial judge in Gentry's death penalty case.  Id. at 10383:22-23 (State's Exhibit 4).

Gentry contends in his Amended Petition, that "[t]hrough the admission of this evidence, Judge Hanley abandoned his neutral role of the trial judge, and, with all the respect and authority he commanded as judge, became a witness for the State immune from cross-examination.  This is an unconstitutional comment on the evidence."  Dkt. #47 at ¶323 (emphasis added).  This contention is intertwined with Gentry's assertion regarding the penalty-phase instructions because Gentry argues that "Judge Hanley's ruling that Mr. Gentry was a future danger was particularly prejudicial in view of the fact that the jury was instructed to

sentence violated Gentry's Sixth, Eighth and Fourteenth Amendment rights).  The Court considers these non-IAC claims in Section II.D.4, below.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION           -38-

consider 'whether there is a likelihood that the defendant will pose a danger to others in the future." Dkt. #47 at ¶320.  Gentry therefore concludes that his counsel were ineffective for both failing to move for redaction of the judgment and sentence and for the failure to propose, or object to, the future-dangerousness mitigating factor instruction.  In the PRP proceeding, the Washington Supreme Court rendered the following decision on these claims:

> During the sentencing phase of the trial, the State offered, and the trial court admitted without objection from Gentry, a document showing Gentry's 1988 conviction for rape and exceptional sentence of 240 months of confinement.  The document went to the jury, along with other documents showing Gentry's criminal history.  Gentry argued on direct appeal introduction of this evidence was error.
>
> Gentry now claims ineffective assistance of counsel because the document revealed the sentencing judge for the rape conviction was the trial judge at the murder trial.  He asserts the failure to redact the judge's name from the sentencing document allowed or invited the jurors to abandon their responsibility to impose sentence and to defer instead to the judge's prior determination that Gentry deserved an exceptionally high sentence in his prior rape conviction.  Gentry contends admitting the judgment bearing the trial judge's name was an unconstitutional comment on the evidence, and his attorneys were ineffective in failing to order a "redacted" copy without the judge's name.  We have already rejected this claim.  State v. Gentry, 125 Wn.2d at 639.  Gentry offers no reason to reconsider that holding, which also prevents him from proving the related ineffective assistance claim.

In re Gentry, 137 Wn.2d at 417.

In this proceeding, Gentry has not shown how this decision is contrary to, or an unreasonable application of clearly established federal law.  At the outset, the Court notes the distinction between state and federal court practice regarding the underlying issue concerning the alleged impermissible judicial comment on the evidence.[44]  The Court here is precluded from reviewing the Washington Supreme Court's underlying decision that under Washington law, Judge Hanley's name on the 1988 rape judgment and sentence was not an impermissible

---

[44] Bute v. Illinois, 333 U.S. 640, 650 n.4 (1948) ("One long recognized difference between the trial procedure in the federal courts and that in many state courts is the greater freedom that is allowed to a federal court, as compared with that allowed to a state court, to comment upon the evidence when submitting a case to a jury.").

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION            -39-

comment on the evidence.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). It is clear, however, that the law of the United States permits the judge to comment to the jury on the evidence in the case.  Quercia v. United States, 289 U.S. 466, 469 (1933); see United States v. Sanchez-Lopez, 879 F.2d 541, 553 (9th Cir. 1989) (citing Quercia, 289 at 469 (a judge may comment upon the evidence and may express an opinion on the facts as long as the judge makes it clear to the jury that all matters of fact are submitted for their determination)).

Notably, Gentry emphasizes in Claim I that "[t]he jury was specifically instructed in the penalty phase that '[t]he evidence that you are to consider consists of the testimony of the witnesses and the exhibits admitted into evidence.'" Dkt. #47 at ¶322 (emphasis in original) (quoting Penalty Phase Instruction No. 1).  What Gentry fails to mention, however, is that the trial court judge later instructed the jury that "[t]he law does not permit me to comment on the evidence in any way and I have not intentionally done so.  If it appears to you that I have commented, during either the trial, the special sentencing proceeding, or the giving of these instructions, you must disregard such comment entirely."  19 REC 10483:6-11; 24 REC 13582 (Instruction No. 1).[45]  There is no evidence that the jury disregarded this instruction.  Because the Court does not find that there was an impermissible comment on the evidence, any motion by Gentry's trial counsel to redact the document would have presumptively been futile, and therefore counsel cannot be deemed ineffective for failing to move to redact the document.[46]

_____

[45]  See also 19 REC 10332:16-25 (discussing this instruction).

[46]  See, e.g., Kimmelman v. Morrison, 477 U.S. 365, 375 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principle allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious[.]"); A.M. v. Butler, 360 F.3d

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION            -40-

Given Gentry's failure to show that there was an impermissible comment on the evidence, Gentry has not shown under <u>Strickland</u> that his counsel's performance was deficient. Furthermore, assuming arguendo that counsel's performance was deficient because they failed to move for redaction of the judgment and sentence, the Court finds that there was no prejudice under the second element of <u>Strickland</u> because the trial court's instructions stated that the jury was not to consider any comments on the evidence, and there has been no showing that the jury neglected to follow this instruction and the resulting verdict was unreliable.[47]

The second part of Gentry's claim challenges his counsel's proposed penalty phase instruction outlining factors that could be considered in determining Gentry's sentence. <u>See</u> 19 REC 10486; 24 REC 13587 (Instruction No. 5). Instead of the eight statutory factors from RCW 10.95.070, Instruction No. 5 provides:

> You are also to consider as mitigating circumstances any other factors concerning the offense or the defendant that you find to be relevant, including, but not limited to, the following:
>
> •     Whether there is a likelihood that the defendant will pose a danger to others in the future;
> •     The circumstances regarding the death of the defendant's father;
> •     The defendant's behavior in dealing with $15,000 of misplaced money;
> •     The impact of a sentence of death on the defendant and his family.

---

787, 795 (7th Cir. 2004) ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion."); <u>Baumann v. United States</u>, 692 F.2d 565, 572 (9th Cir. 1982) ("Baumann could not conceivably have been prejudiced by his counsel's failure to move for dismissal of any of the counts of the indictment because, as the district court concluded, they were not defective as a matter of law. The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."). It is the same here. In order to succeed on Claim I, Gentry must prove his assertion that there was an impermissible comment on the evidence before he can establish that counsel was ineffective for failing to move to redact the "comment." He has not done so. Therefore, his IAC claim fails because it was correctly decided by the Washington Supreme Court.

[47] To the contrary, Gentry's trial counsel successfully moved to redact a prejudicial portion of State's Exhibit 3 regarding an HIV testing requirement as part of his sentence for the 1988 rape conviction. <u>See</u> 19 REC 10322-10324 (motion to exclude page 8 from State's Exhibit 3).

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION     -41-

19 REC 10486-10487; 24 REC 13587.  The first listed factor is expressly from RCW

10.95.070(8), and the other three factors were proposed for reasons explained by Gentry's

counsel:

> [T]he reasons that we don't want the statutory mitigating factors listed is because what
> happens is that the state stands up and just checks them off, there's no evidence of this
> one, there's no evidence of this one, there's no evidence of this one.  And we're not
> asserting that there's evidence of those.
>
> So the statutory factors we want listed, I think in my Instruction I only included one.  And
> then there are non-statutory factors that we would also like to elicit.

19 REC 10328:14-22.  In Gentry's direct appeal, the State contested the use of the non-statutory

factors and the Washington Supreme Court held that while the "better practice" is that

nonstatutory factors be excluded, there was no error in Gentry's case because the "listing of

nonstatutory mitigating factors was requested by, and was for the benefit of, the Defendant[.]"

State v. Gentry, 125 Wn.2d at 651 (emphasis added).  Accordingly, Gentry's counsel

successfully obtained three favorable mitigating-factor instructions.  Despite this success, Gentry

now contends that counsel's proposal of the one statutory factor under RCW 10.95.070

constituted Sixth Amendment deficient performance.  The Court here, however, cannot find that

counsel's successful pursuit of three non-statutory factors favorable to Gentry, coupled with one

statutory factor that Gentry asserts in hindsight was not favorable, was ineffective assistance.[48]

"The Sixth Amendment guarantees reasonable competence, not perfect advocacy[.]"

Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

Although the Ninth Circuit has held in cases like United States v. Span, 75 F.3d 1383 (9th

Cir. 1996), that an attorney's failure to procure favorable jury instructions constitutes ineffective

assistance, the Ninth Circuit has qualified that these decisions represent "exceptional cases."

---

[48]  Despite Gentry's trial counsel's exhaustive declarations regarding their alleged missteps, there
is no indication even now that they considered their advocacy in proposing the one statutory mitigating
factor to be deficient.  See 37 REC 19678 (Robinson Decl.) at ¶¶58-60 (describing the alleged failures
with the penalty-phase instructions); 37 REC 19692 at ¶¶56-58 (same).

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -42-

See United States v. Alferahin, 433 F.3d 1148, 1161 (9th Cir. 2006) ("We held in Span that the attorney's failure to procure favorable jury instructions constituted ineffective assistance of counsel."); Weighall v. Middle, 215 F.3d 1058, 1063 (9th Cir. 2000) (holding that trial counsel's failure to request an additional instruction was not unreasonable, and stating that "Span and Capps [v. Sullivan, 921 F.2d 260 (10th Cir. 1990)] were exceptional cases, and counsel's performance here is in no way comparable."). The Court finds here that Gentry's counsel, on balance, procured favorable mitigation-factor instructions given that three out of the four factors were favorable to Gentry. "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 700 (2002). Therefore, for all of the reasons stated above, the Washington Supreme Court's decision on Gentry's Claim I was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the Court grants respondent's summary judgment motion on this claim and denies Claim I in Gentry's Amended Petition.

### (j)   Victim impact testimony

In Claim J of his Amended Petition, Gentry asserts that the admission of Cassie Holden's father's testimony in the penalty phase was the product of ineffective assistance of counsel, and violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights. See Dkt. #47 ("Claim J") at ¶¶15; 325-345. Claim J is based exclusively on the state-court record, and respondent moves for summary judgment on all parts of the claim.[49] See Dkt. #272. The Court first addresses the IAC portion of Claim J before turning to the Eighth Amendment and due process issues.

---

[49] In opposition to respondent's summary judgment motion, Gentry states that "[i]n addition to asserting that trial counsel was ineffective, this claim also asserts the admission of victim impact testimony violated Mr. Gentry's Fifth, Sixth, Eighth, and Fourteenth Amendment rights[.]" Dkt. #275 at 12-13. Therefore, respondent incorrectly contends in reply that "Mr. Gentry does not oppose Respondent's summary judgment motion with regard to the non-IAC aspects of Claims I and J." Dkt. #277 at 6-7. Accordingly, the Court considers all the sub-parts of Claim J here, including the IAC, the Eighth Amendment, and the due process issues.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -43-

1    Claim J stems from the fact that on June 27, 1991, one day after the jury's verdict in the

2    guilt-phase of Gentry's trial, the United States Supreme Court decided <u>Payne v. Tennessee</u>, 501

3    U.S. 808 (1991), which held that "the Eighth Amendment erects no per se bar" if a state chooses

4    to permit the admission of victim impact evidence.  <u>Id.</u> at 827.  Based in part on the <u>Payne</u>

5    decision, the Gentry trial court ruled that Mr. Holden could testify in the penalty phase.  19 REC

6    10308-10309.[50]

7    Gentry contends that his counsel were ineffective because they "never questioned

8    prospective jurors about victim impact evidence and did nothing to prepare for the admission of

9    such evidence."  Dkt. #47 at ¶325; Dkt. #275 at 12 ("Mr. Gentry has established that he was

10   denied effective assistance of counsel because his trial lawyers failed to prepare for and

11   investigate victim impact evidence.").  The Washington Supreme Court rejected this claim based

12   on its decision from Gentry's direct appeal.  <u>See</u> <u>In re Gentry</u>, 137 Wn.2d at 408 ("Gentry

13   vigorously contended during his appeal the admission of this victim impact testimony was

14   improper.  We exhaustively considered and rejected his arguments.  <u>Gentry</u>, 125 Wn.2d at 618-

15   33.  He now largely repeats the arguments we rejected without offering any reasons why we

16   should reconsider them.  We therefore decline to do so."); 37 REC 19601-19607 (presenting the

17   Sixth Amendment claim in the Amended PRP).

18   First, regarding Gentry's contention that his counsel failed to question prospective jurors

19   about their view on victim impact evidence, as <u>Strickland</u> explains, ineffective assistance of

20   counsel claims must be evaluated from counsel's perspective at the time of trial.  466 U.S. at

21   689.  In Gentry's case, <u>Payne</u> was not decided until more than two months after the conclusion

22   of voir dire on May 14, 1991.  <u>See</u> 13 REC 6944.  Therefore, the Court cannot conclude that the

23

24   _____

     [50] "So, given the holding in [<u>Payne</u>] and that Constitutional Amendment in the State [Wash.

25   Const. art. I, § 35 (Victims of crimes – Rights)], it seems to me that the state of the law at this point is
     that one representative of the victim may address the jury, to the limited extent that they may discuss the

26   effect of the murder on the survivors of the victim.  So that would be my ruling.  <u>Id.</u> at 10309:7-13.

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28   DENYING AMENDED HABEAS PETITION          -44-

performance of Gentry's counsel during voir dire was deficient in failing to anticipate that the Supreme Court in <u>Payne</u> would overturn established precedent from both <u>Booth v. Maryland</u>, 482 U.S. 496 (1987), and <u>South Carolina v. Gathers</u>, 490 U.S. 805 (1989).  <u>See, e.g., Knox v. United States</u>, 400 F.3d 519, 522-23 (7th Cir. 2005) ("A failure to anticipate shifts in legal doctrine cannot be condemned as objectively deficient.").

Second, the Court rejects the portion of Claim J contending that Gentry's counsel was ineffective during the penalty phase by failing to prepare for and investigate the victim impact evidence.  As an initial matter, the Court notes that Gentry's assertion that "[t]rial counsel did not investigate the state's victim impact witness and were unprepared to cross-examine that witness" distorts the record.  Dkt. #275 at 12.  In fact, defense counsel interviewed Mr. Holden before his testimony and Gentry's counsel thereafter acknowledged that "Mr. Holden was very cooperative during the interview and answered all of the questions that were asked of him."  19 REC 10342:19-21; 37 REC 19598.  Additionally, before Mr. Holden's testimony, Gentry's counsel expressed on the record the strategic risk of cross examining Cassie's father:  "Maybe Justice Rehnquist said it best.[51]  Uhm, obviously I'm not going to cross examine Mr. Holden, you know, vigorously, even if there are things that he should be cross examined about, because this jury would not allow us to do that.  Mr. Gentry would end up paying for it."  19 REC 10298:17-22.  After Mr. Holden's testimony, Gentry's counsel in fact decided not to risk cross examining Mr. Holden.  Under <u>Strickland</u>, the Court must presume that counsel was competent in making this decision, and Gentry "must rebut this presumption by showing that his [counsel's] performance was objectively unreasonable under prevailing professional norms and was not the product of sound strategy."  <u>Duncan</u>, 528 F.3d at 1234 (citing <u>Strickland</u>, 466 U.S. at 688-89).  Gentry attached copies of dissolution of marriage documents from the victim's

---

[51]  <u>See</u> <u>Payne</u>, 501 U.S. at 823 (noting "that for tactical reasons it might not be prudent for the defense to rebut victim impact evidence").

1  parents as an exhibit to his Amended PRP.  See 37 REC 19599-19600; 20009-20015 (Amended

2  PRP Ex. 58).  Gentry contended in his Amended PRP that had the information contained in the

3  dissolution file been available prior to the penalty phase, "[t]he victim's problems at school and

4  at home, allegations of drug abuse, and the victim's adjustment to her change in custody shortly

5  before the crime at issue [were] all subject areas that would have been investigated by defense

6  counsel had they known that victim impact evidence would be admitted, and had they been

7  given sufficient opportunity to investigate."  37 REC 19600-19601.  Even if this information

8  was available to counsel prior to the penalty phase, however, Gentry has not shown that it would

9  have been used to cross examine Mr. Holden.  Although Gentry's counsel stated in their

10  declarations that they "would have obtained copies of the court file of Mr. Holden's dissolution

11  with the victim's mother" had they known victim impact evidence would have been admitted,

12  counsel notably did not state that the information from the dissolution file would have changed

13  their decision to refrain from cross examining Mr. Holden.  See 37 REC 19677 at ¶53; 37 REC

14  19691 at ¶51.  For all these reasons, Gentry has failed to show that his counsel's performance in

15  deciding not to cross examine the victim's father in the penalty phase was objectively

16  unreasonable and not simply the product of sound penalty-phase strategy.  Nor should a court

17  presume that the impact of the murder of a child is somehow lessened if the parents are divorced

18  or the victim has had problems adjusting to the divorce of her parents.

19        The Court turns next to the Eighth Amendment part of Claim J.  In the PRP proceeding,

20  the Washington Supreme Court deferred to its prior consideration of Gentry's Eighth

21  Amendment claim on direct appeal, where the Court extensively analyzed the claim and

22  ultimately held:

23        We therefore conclude that victim impact evidence is admissible in the sentencing
         phase of capital cases and that trial courts, which are experienced in balancing the
24        probative against the prejudicial, should exercise their informed discretion in
         deciding the scope of permissible victim impact evidence in a given case.  In the
25        case before us, there was no error in the admission of the victim's father's
         statements about his young murdered daughter or about the profound effect of the
26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION          -46-

1
2

murder upon her family.  As the <u>Payne</u> Court recognized, victim impact evidence may properly include a description of the emotional trauma suffered by the victim's family.

3   <u>State v. Gentry</u>, 125 Wn.2d at 632-33; 621 ("In light of the United States Supreme Court's

4   decision in <u>Payne</u>, we conclude that the Defendant's federal constitutional rights were not

5   violated by the introduction of victim impact evidence."); <u>In re Gentry</u>, 137 Wn.2d at 408.

6          The Supreme Court's <u>Payne</u> decision was clearly established law at the time the

7   Washington Supreme Court issued its 1999 <u>In re Gentry</u> decision.  After the Supreme Court

8   decided <u>Payne</u>, the Ninth Circuit reiterated in <u>Gretzler v. Stewart</u>, 112 F.3d 992 (9th Cir. 1997),

9   that "evidence about a victim's characteristics and the impact of the murder on the victim's

10  family is relevant and admissible at a death penalty sentencing proceeding.  Admission of such

11  evidence will only be deemed unconstitutional if it is so unduly prejudicial that it renders the

12  sentence fundamentally unfair."  <u>Id.</u> at 1009 (internal citation to <u>Payne</u> omitted).  Based on the

13  foregoing authority, Gentry has not shown that the Washington Supreme Court's decision that

14  the admission of the victim impact testimony was permissible under the Eighth Amendment was

15  contrary to, or an unreasonable application of, clearly established federal law, or based on an

16  unreasonable determination of the facts.  The only remaining question, therefore, is whether the

17  victim impact testimony was so unduly prejudicial that it resulted in a fundamentally unfair trial

18  in violation of Gentry's due process rights.  <u>See</u> <u>Payne</u>, 501 U.S. at 825 ("In the event that

19  evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair,

20  the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.").

21         As with the Eighth Amendment portion of Claim J, pursuant to <u>Payne</u>, the Washington

22  Supreme Court on direct appeal extensively analyzed whether the admission of Mr. Holden's

23  testimony rendered Gentry's trial fundamentally unfair.  <u>See</u> <u>State v. Gentry</u>, 125 Wn.2d at

24  619–620.  After comparing the penalty-phase testimony from <u>Payne</u> to Gentry's case, the

25  Washington Supreme Court ultimately concluded that Mr. Holden's testimony "was no more

26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION          -47-

1   unfairly prejudicial or inflammatory than the evidence and argument which was introduced in

2   the Payne case—and which the [United States Supreme] Court did not find fundamentally

3   unfair." State v. Gentry, 125 Wn.2d at 619.  The Court agrees.

4         In Payne, the petitioner horrifically murdered Charisse Christopher and her two-year-old

5   daughter Lacie with a butcher knife.  501 U.S. at 811-13.  Miraculously, Charisse's three-year-

6   old son, Nicholas, survived despite the fact that petitioner had stabbed the knife completely

7   through Nicholas's body several times.  Id. at 812.  In the penalty phase Mary Zvolanek,

8   Charisse's mother and grandmother of Nicholas and Lacie, testified:  "He [Nicholas] cries for

9   his mom.  He doesn't seem to understand why she doesn't come home.  And he cries for his

10  sister Lacie.  He comes to me many times during the week and asks me, Grandmama, do you

11  miss my Lacie.  And I tell him yes.  He says, I'm worried about my Lacie." Payne, 501 U.S. at

12  814-15.  In her concurring opinion, Justice O'Connor emphasized that "I do not doubt that the

13  jurors were moved by this testimony—who would not have been?  But surely this brief

14  statement did not inflame their passions more than did the facts of the crime. . . .  In light of the

15  jury's unavoidable familiarity with the facts of Payne's vicious attack, I cannot conclude that the

16  additional information provided by Mary Zvolanek's testimony deprived petitioner of due

17  process." Id. at 532 (O'Connor, J., concurring).

18        In Gentry's case, Mr. Holden testified in the penalty phase in response to a question

19  about whether he thought about Cassie often that "[e]veryday Cassie goes through my mind.

20  That's the first thing I do in the mornings [is] get up and kind of look up and say, 'Hello,

21  Cassie'." 19 REC 10367:16-18.  Similar to Payne, while the Court here has no doubt that the

22  jury was moved by Mr. Holden's testimony concerning the void created by Cassie's tragic loss,

23  given the jury's knowledge of the nature of Cassie's death, the Washington Supreme Court's

24  conclusion under Payne that Mr. Holden's testimony was not so unduly prejudicial that it

25  rendered Gentry's sentence fundamentally unfair, is not contrary to, or an unreasonable

26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION          -48-

application of, clearly established federal law, or based on an unreasonable determination of the facts.

The remaining part of Claim J is Gentry's contention that the "admission of victim impact testimony deprived Mr. Gentry of his Fifth and Fourteenth Amendment rights to due process of law, which protects criminal defendants against novel or unforeseeable developments in judicial doctrine, and unlawful application of state law."  Dkt. #47 at ¶15.3.  Washington's constitutional amendment regarding victim impact evidence was approved November 7, 1989—after Cassie's murder in June 1988, but before Gentry's trial commenced in 1991.  As previously discussed, Payne was decided immediately before the penalty phase.  In deciding Gentry's Claim J, the Washington Supreme Court stated:

> [Gentry] claims for the first time allowing the victim impact statement in his trial had the same effect as an unconstitutional ex post facto law, and therefore denied him due process. . . .  Holden's testimony, to the extent it informed the jury of his personal loss, was obviously to Gentry's disadvantage. . . .  Allowance of victim impact testimony simply changed a rule of evidence, and did not increase the standard of punishment Gentry faced.  Thus, there was no violation of the prohibition against ex post facto laws in Gentry's trial.

In re Gentry, 137 Wn.2d at 408-409 (internal citations omitted).  Although neither the United States Supreme Court nor the Ninth Circuit[52] has considered this specific question, federal circuit courts facing similar issues have held that the admission of victim impact evidence does not violate the ex post facto prohibition.  For example, in Nooner v. Norris, 402 F.3d 801 (8th Cir. 2005), cert. denied, 126 S. Ct. 2037 (2006), as part of a § 2254 habeas corpus petition, Nooner asserted that the admission of evidence under Arkansas's victim impact statute violated the Constitution's ex post facto clause, U.S. Const. art. 1, § 10.  Id. at 804.  Like Gentry's case,

---

[52]   The Ninth Circuit has, however, held that "[a] state law violates the Ex Post Facto Clause of the United States Constitution if it imposes punishment for an act that was not punishable when committed, of if it increases the amount of punishment beyond that authorized at the time the act was committed."  Powell v. Ducharme, 998 F.2d 710, 713 (9th Cir. 1993) (citing Weaver v. Graham, 450 U.S. 24, 28-29 (1981)).  Here, the admission of the victim impact evidence neither imposed a new punishment nor increased the amount of Gentry's punishment.

1    the statute at issue was enacted after the crime, but prior to trial. Id. at 807. Before holding that

2    the state court did not err in deciding that the Arkansas statue did not violate the ex post facto

3    clause, the Eighth Circuit considered prior authority on this issue:

> The Tenth Circuit has held that victim impact evidence "does not violate the ex post facto prohibition . . . because it neither changes the quantum of proof nor otherwise subverts the presumption of innocence." Neill v. Gibson, 278 F.3d 1044, 1053 (10th Cir. 2001). Similarly, the Fourth Circuit has concluded that admission of victim impact evidence in a sentencing conducted prior to Payne was not prejudicial because the rule in Payne would apply at any resentencing. Washington v. Murray, 952 F.2d 1472, 1480 (1991).[53] We agree with our sister circuits and conclude that the Arkansas victim impact evidence statute is procedural in nature and does not offend the ex post facto clause. Arkansas's statute does not alter the potential penalty faced by any defendant, nor does it alter the state's burden of proof. Cf. Payne, 501 U.S. at 825 ("Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities."). Accordingly, the state court's determination that the Arkansas statute does not violate the ex post facto clause was not contrary to Supreme Court precedent.

Id. at 807 (alterations in original). Based on this persuasive authority, Gentry has not shown that

the Washington Supreme Court's decision that there was no violation of the ex post facto clause

in Gentry's trial was contrary to, or an unreasonable application of, clearly established federal

law. And, for all the reasons discussed above, the Court concludes that the Washington

Supreme Court's decision on all the parts of Gentry's Claim J, was not contrary to, or an

unreasonable application of, clearly established federal law. Accordingly, the Court grants

respondent's summary judgment motion and denies Claim J in Gentry's Amended Petition.

### (k)   Jury instructions

Gentry asserts that instructional errors violated his Eighth and Fourteenth Amendment

---

[53]  As in Nooner, the Washington Supreme Court cited Washington v. Murray with approval. See In re Gentry, 137 Wn.2d at 409. Notably, the Washington Supreme Court also cited the underlying Nooner state court decision. Id. (citing Nooner v. State, 322 Ark. 87 (Ark. 1995)).

rights.  See Dkt. #47 ("Claim K") at ¶¶21; 346-348.[54]  This claim is composed of two parts.

First, Gentry contends in the guilt-phase that "[t]he 'to convict' instruction for first degree

murder deprived Mr. Gentry of his Fourteenth Amendment right to be found not guilty of either

alternative form of first degree murder so long as the jury found reasonable doubt as to any one

element within that alternative."  Dkt. #47 at ¶21; 346.  Second, Gentry contends that "the jury

instructions given at sentencing erroneously failed to explain to, and instead mislead, the jury

regarding their duty to consider each mitigating circumstance independently as well as

cumulatively, violating Mr. Gentry's Eighth and Fourteenth Amendment rights."  Id. at ¶348.

Respondent moves for summary judgment on both parts of Claim K.  See Dkt. #272 at 8.

Gentry moves for summary judgment on the portion of the claim regarding the sentencing

instructions, but he failed to oppose respondent's motion regarding the "to convict" instruction.

See Dkt. #275 at 15; Dkt. #278 at 2; 24 REC 13444-13445 (Instruction No. 10).  As a result, the

Court queried in its August 29, 2008 "Order on Oral Argument Addressing the Pending

Summary Judgment Motions," (Dkt. #282), "[w]hether the portion of Claim K concerning the

'to convict' instruction has been abandoned given that Gentry failed to oppose respondent's

summary judgment motion on this issue and Gentry failed to fully explain the constitutional

basis of this claim in his Amended Petition."  In response to this question at oral argument,

Gentry's counsel conceded that the portion of Claim K concerning the "to convict" instruction

had been abandoned and need not be considered by the Court.  Based on this representation, this

portion of Claim K is denied.

      Before turning to the portion of Claim K concerning the sentencing instructions, the

Court addresses the legal standard for doing so.  The Supreme Court has "established that the

---

[54]  In his Amended Petition, Gentry dovetailed an ineffective assistance of counsel claim into his substantive claims concerning instructional errors.  See Dkt. #47 at ¶¶ 14.8-14.10 (trial counsel); 18 (appellate counsel); see also ¶ 25.5.3  Given the Court's ruling below that there were no instructional errors, however, Gentry's accompanying IAC allegations fail as well.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -51-

1    sentencer may not be precluded from considering, and may not refuse to consider, any

2    constitutionally relevant mitigating evidence, and that the State may structure the jury's

3    consideration of mitigation so long as it does not preclude the jury from giving effect to it."

4    Weeks v. Angelone, 528 U.S. 225, 232 (2000).  The Supreme Court, however, has "never held

5    that the State must structure in a particular way the manner in which juries consider mitigating

6    evidence."  Id. at 233.  Given Gentry's claim that the mitigation instructions were ambiguous

7    and therefore erroneously interpreted by the jury, the touchstone of the Court's inquiry here is

8    "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

9    way that prevents the consideration of constitutionally relevant evidence."  Boyde v. California,

10   494 U.S. 370, 380 (1990); see Dkt. #275 at 18 (citing Boyde).

11       The gravamen of Claim K is Gentry's contention that an inconsistency between the use of

12   the singular "mitigating circumstance" and plural "mitigating circumstances" in the sentencing

13   instructions resulted in the jury's failure to consider the totality of the mitigating evidence.[55]  See

14   Dkt. #275 at 15-16.  It is true that the sentencing instructions referred to "mitigating

15   circumstance" in both the singular and the plural.  The challenged instructions provide in

16   relevant part:[56]

17           During these special sentencing proceedings, the State bears the burden of proving
             beyond a reasonable doubt that there are not sufficient mitigating circumstances to
18           merit leniency.[57]

19                                                    . . .

---

20       [55] Both parties agree that the record is complete for Claim K.  At oral argument, Gentry's
21   counsel conceded that an evidentiary hearing is not required on this claim as evidenced by the fact that
     Gentry moved for summary judgment on Claim K.  Additionally, in his reply in support of his cross-
22   motion for summary judgment, Gentry contends that the Court should evaluate this part of Claim K de
23   novo.  See Dkt. #278 at 2.  The Court has done so, and has not deferred to the Washington Supreme
     Court's decision on this portion of the claim.

24       [56] See Dkt. #275 at 15-16 (quoting parts of Instruction Nos. 1, 3-6).
25
         [57] 24 REC 13581 (Instruction No. 1) (emphasis added).
26

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28   DENYING AMENDED HABEAS PETITION          -52-

During this sentencing phase proceeding, the State has the burden of proving to you beyond a reasonable doubt that there is not <u>a sufficient mitigating circumstance</u> to merit leniency.  If the state meets this burden the death penalty will be imposed.  The defendant does not have to prove the existence of any <u>mitigating circumstance or the sufficiency of any mitigating circumstance.</u>[58]

. . .

If, after such consideration, you have an abiding belief that there is not <u>a sufficient mitigating circumstance</u> to merit leniency, you are satisfied beyond a reasonable doubt.[59]

. . .

The question you are required to answer is as follows:  Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that <u>there is [sic] not sufficient mitigating circumstances to merit leniency</u>?[60]

. . .

<u>A mitigating circumstance is a fact</u> about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the

---

[58]  24 REC 13585 (Instruction No. 3) (emphasis added).

[59]  <u>Id.</u>

[60]  24 REC 13586 (Instruction No. 4) (emphasis added).  With the exception of the grammatical error, this instruction is identical to the language from Washington's death penalty statute, RCW 10.95.060(4), and the Washington Pattern Jury Instruction, WPIC 31.06 (Question For Jury—Life Without Parole—Definition (Capital Cases)).  RCW 10.95.060(4) states:  "Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question:  'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?'"  WPIC 31.06 states:  "The question you are required to answer is as follows:  Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"  11 Wash. Prac., <u>Washington Pattern Jury Instructions: Criminal</u> at 355 (2d ed. 1994).  In the comments to 31.06, the WPIC Committee addressed the issue of the use of plural versus singular "mitigating circumstance," but concluded that no clarifying instruction was necessary.  <u>See id.</u> at 356 (Comment to 31.06) ("The statutory question uses the plural form in speaking of 'mitigating circumstances'.  In a given case, there could be concern with the possibility of a juror's inferring that a single mitigating circumstance is per se insufficient to merit leniency.  The committee was satisfied that the law is to the contrary.  However, it did not view any additional clarifying instruction as being ordinarily necessary.").  Notably, there was no concern expressed, however, that the proposed instruction might preclude the jury from considering any of the relevant mitigating evidence.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -53-

degree of moral culpability or which justifies a sentence less than death, although it does not justify or excuse the offense.[61]

. . .

[T]he fact that the defendant has not testified cannot be used to infer that there is not sufficient <u>mitigating circumstances</u> to merit leniency[.][62]

The Special Verdict form also stated in part:

Having in mind the crime of which the defendant has been found guilty, has the State proven beyond a reasonable doubt that there are not sufficient <u>mitigating circumstances</u> to merit leniency?[63]

In opposition, Gentry relies heavily on <u>Smith v. McCormick</u>, 914 F.2d 1153 (9th Cir. 1990), which held that mitigating circumstances must be weighed "together." <u>Id.</u> at 1169 ("[A] sentencer, in addition to not excluding from consideration any relevant mitigating evidence, must also weigh all of the mitigating circumstances 'together.'"); 1168 ("Our capital sentencing jurisprudence makes clear that even if Smith's record or mental impairment are not in themselves cause for a sentence less than death, they are still relevant to mitigation and must be weighed in conjunction with other factors to determine if all of the circumstances together warrant a lesser sentence."); <u>see</u> Dkt. #275 at 17 (quoting <u>Smith</u>).

While the Court appreciates Gentry's focus on the inconsistency between the singular and plural form of "circumstance(s)" in the instructions, as the Supreme Court acknowledged in <u>Boyde</u>:

Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might.  Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

---

[61] <u>Id.</u> at 13587 (Instruction No. 5) (emphasis added).

[62] <u>Id.</u> at 13588 (Instruction No. 6) (emphasis added).

[63] <u>Id.</u> at 13591(Special Sentencing Verdict Form) (emphasis added).  Again, this language follows RCW 10.95.060(4).

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION          -54-

494 U.S. at 380-81.  As a result, the Supreme Court determined that "[t]here is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation."  Id. at 380.  Here, the assertion that the sentencing jury failed to consider each mitigating circumstance independently as well as cumulatively, based on the claimed ambiguity in the instructions, is mere speculation.  The Court finds and concludes that the sentencing instructions did not preclude the jury from giving effect to any of the mitigating evidence nor did they preclude the jury from considering the evidence "together."  The way the case was presented in closing argument of the penalty phase bears this out.

In closing argument, Gentry's counsel did not once refer to the jury's instructions regarding consideration of mitigating circumstances.  See 19 REC 10504-10518 (Gentry's penalty-phase closing argument).  Instead, Gentry's counsel requested that the jury consider all the evidence.  Id. at 10517:25-10518:1 ("I don't ask you to ignore any of the evidence").  The State also did not argue that the jury should disregard consideration of any mitigating evidence.  First, the State in closing argued that Instruction Number 4 "basically says, if the state has proven to you beyond a reasonable doubt that this defendant (indicating) doesn't merit leniency, or that there's not a good enough reason why this man (indicating) should be spared, then you have to follow the law."  19 REC 10490:21-25 (emphasis added).  In discussing Instruction Number 5, the state argued: "And what's a 'mitigating circumstance'?  What factors can you consider?  Well, you'll read some factors and I'll discuss them in a minute.  But basically, a 'mitigating factor' is something about the crime or the defendant, which in fairness and mercy would lead you to believe that the state has not met its burden."  19 REC 10491:14-20.  Finally, in concluding, the State argued that the death penalty was warranted "[b]ecause in the cold light of day, ladies and gentlemen, there is not a reason, there is not sufficient circumstances to merit leniency."  Id. at 10519:17-19.  These arguments in no way suggest that the jury should ignore

any of the mitigating evidence or should isolate some of the evidence and disregard consideration of all the evidence.

Based on the reasoning set forth above, the Court grants respondent's motion for summary judgment, denies Gentry's cross-motion, and denies Claim K of Gentry's Amended Petition.

### (l)    Post-conviction discovery, evidentiary hearing, and resources

In Claim L of his Amended Petition, Gentry asserts:

> The state court's failure, during the post-conviction proceedings, to grant discovery, provide funds to retain the services of necessary experts and investigations and to hold an evidentiary hearing, constituted a suspension of the constitutional right to a writ of habeas corpus and denied Mr. Gentry a fair and adequate corrective process for the hearing and determination of his claims for violation of Federal Constitutional guarantees.

Dkt. #47 at 68 ("Claim L"); ¶22.  Respondent moves for summary judgment on Claim L contending it "fails to state a ground on which federal habeas corpus relief can be granted."  Dkt. #272 at 8.  Gentry opposes summary judgment.[64]  As respondent emphasized in the amended answer, "'A post-conviction proceeding is not part of the criminal process itself, but is instead a civil action designed to overturn a presumptively valid criminal judgment.  Nothing in the Constitution requires the States to provide such proceedings[.]'"  Dkt. #50 at 126 (quoting Murray v. Giarratano, 492 U.S. 1, 13 (O'Connor, J., concurring)).

Following from this, the Ninth Circuit held that "[w]e join the majority [of circuits] and affirm the district court's holding that a petition alleging errors in the state-post conviction review process are [sic] not addressable through habeas corpus proceedings."  Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989) (per curium) (citing Hopkinson v. Shillinger, 866 F.2d 1185, 1218-20 (10th Cir. 1989); Millard v. Lynaugh, 810 F.2d 1403, 1410 (5th Cir. 1987);

---

[64]   Although Gentry initially cross-moved for summary judgment on this Claim L, he now contends in reply that summary judgment is not appropriate.  See Dkt. #275 at 13; 19-21; Dkt. #278 at 5.

1   Kirby v. Dutton, 794 F.2d 245, 247-48 (6th Cir. 1986); and Mitchell v. Wyrick, 727 F.2d 773,

2   774 (8th Cir. 1984 ) (per curium)); see Cress v. Palmer, 484 F.3d 844, 853 (6th Cir. 2007) ("We

3   have clearly held that claims challenging state collateral post-conviction proceedings cannot be

4   brought under the federal habeas corpus provision, 28 U.S.C. § 2254, because the essence of

5   habeas corpus is an attack by a person in custody upon the legality of that custody[.]") (internal

6   quotation marks and citations omitted); Ortiz v. Stewart, 149 F.3d 923, 939 (9th Cir. 1998)

7   ("Moreover, this court has specifically stated that federal habeas relief is not available to redress

8   alleged procedural errors in state post-conviction proceedings."); Kirby, 794 F.2d at 247 ("[T]he

9   writ is not the proper means by which prisoners should challenge errors or deficiencies in state

10  post-conviction proceedings . . . because the claims address collateral matters and not the

11  underlying state conviction giving rise to the prisoner's incarceration.").

12        Because Gentry's Claim L is directed at collateral procedural errors in the Washington

13  post-conviction PRP proceeding, and based on the authority set forth above, the Court concludes

14  that Claim L cannot be addressed in this federal habeas proceeding.  Therefore, the Court grants

15  respondent's summary judgment motion and denies Claim L in Gentry's Amended Petition.

16        **3.**    **Cumulative error**

17        In addition to analyzing Gentry's individual claims, the Court must also consider the

18  prejudice from the Brady/Napue and IAC claims cumulatively.  Harris v. Wood, 64 F.3d 1432,

19  1438-39 (9th Cir. 1995).  The Washington Supreme Court in In re Gentry decided that there

20  were "no errors to cumulate."  In re Gentry, 137 Wn.2d at 417.  However, given this Court's

21  determination of the Brady/Napue claims and dismissal of some of the IAC claims based on

22  Strickland's second element, these claims must be considered together under the cumulative

23  error doctrine.  See Davis v. Woodford, 333 F.3d 982, 1007 (9th Cir. 2003) ("It is true that,

24  although individual errors may not rise to the level of a constitutional violation, a collection of

25  errors might violate a defendant's constitutional rights.") (citing Harris, 64 F.3d at 1438).  In the

26

27  ORDER GRANTING RESPONDENT'S MOTION FOR
    SUMMARY JUDGMENT, DENYING PETITIONER'S
    CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28  DENYING AMENDED HABEAS PETITION     -57-

1   "Order on Petition for Habeas Relief Based on <u>Brady</u> and <u>Napue</u> Violations" (Dkt. #283), the

2   Court previously determined that the cumulative effect of the <u>Brady/Napue</u> material did not

3   constitute a constitutional violation.  After considering the entire record from both the guilt and

4   penalty phases, and the record as developed during this habeas proceeding, the Court finds that

5   any additional prejudice stemming from the effectiveness of Gentry's counsel, as discussed

6   above in Sections II.D.2(b), (c), and (i), does not change the Court's previous analysis.  Any

7   missteps or misjudgments of Gentry's counsel even when considered cumulatively with the

8   States's failure to disclose the <u>Brady/Napue</u> material did not render Gentry's trial fundamentally

9   unfair.  Therefore, the Court concludes that the collection of errors in this case did not violate

10   Gentry's constitutional rights.[65]

11        **4.**    **Remaining claims**

12       Although not separately identified by letter, Gentry claims in paragraphs nineteen and

13   twenty of his Amended Petition that "Washington's death penalty statute is unconstitutionally

14   vague, in violation of the Eighth Amendment . . . and violates the Eighth and Fourteenth

15   Amendments because the mandatory sentence review creates an unacceptable risk of the

16   arbitrary and capricious imposition of the death penalty."  Dkt. #47 at ¶¶19; 20.  On direct

17   appeal, the Washington Supreme Court held that "[w]e conclude, as we have concluded

18   repeatedly in the past, that RCW 10.95.060(4) is constitutional."  <u>State v. Gentry</u>, 125 Wn.2d at

19   653; <u>see</u> <u>In re Gentry</u>, 137 Wn.2d at 417 (incorporating decision from direct appeal).

20       The Ninth Circuit recently affirmed the facial constitutionality of Washington's death

21   penalty statute.[66]  And, in his Amended Petition, Gentry has failed in any way to show that the

22

23          [65] <u>But see</u> Section II.D.5 (granting Gentry leave to file a motion for reconsideration regarding the

24   need for merits briefing on this issue).

25          [66] <u>See</u> <u>Brown v. Lambert</u>, 451 F.3d 946, 948 (9th Cir. 2006) ("Thus, our broader holding in

26   [<u>Campbell v. Kincheloe</u>, 829 F.2d 1453, 1464 (9th Cir. 1987)]—that the Washington statute does not fail

27   ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND

28   DENYING AMENDED HABEAS PETITION      -58-

Washington Supreme Court's decision concerning the constitutionality of RCW 10.95.060(4) is contrary to, or an unreasonable application of, clearly established federal law.  Therefore, Gentry's Amended Petition on this claim is denied.

Gentry also contends, in paragraphs sixteen and seventeen of the Amended Petition, and as part of Claim I, that:[67]

> 16.  The admission of the un-redacted judgment and sentence, which contained the information that the judge presiding over the capital murder trial had previously sentenced Mr. Gentry to an exceptional sentence of twice the standard range, violated Mr. Gentry's Sixth, Eighth and Fourteenth Amendment rights because the jury relied upon information that Mr. Gentry had no opportunity to deny or explain[; and]
>
> 17.  The admission of the un-redacted judgment and sentence violated Mr. Gentry's Eighth Amendment right to heightened reliability in death sentencing, because the jury relied upon information Mr. Gentry had no opportunity to deny or explain evidence [sic] in sentencing him to death.

Dkt. #47 at 5; see also id. at ¶¶313-321; 324.

In its decision on Gentry's PRP, the Washington Supreme Court referred to its decision on direct appeal for this claim.  See In re Gentry, 137 Wn.2d at 417 (stating "Gentry argued on direct appeal introduction of this evidence was error. . . .  We have already rejected this claim. State v. Gentry, 125 Wn.2d at 639.").  On direct appeal, the Washington Supreme Court concluded that "[t]here was no error in admitting a judgment and sentence as evidence of the Defendant's past criminal record during the penalty phase of the trial."  State v. Gentry, 125

---

to adequately guide jury discretion with respect to anything—necessarily precludes Brown's claim.") (emphasis in original), reversed on other grounds sub nom. Uttecht v. Brown, 127 S. Ct. 2218 (2007), on remand, 530 F.3d 1031, 1033 (9th Cir. 2008) ("We upheld Washington's death penalty statute, Brown v. Lambert, 451 F.3d 946, 947-48 (9th Cir. 2006), but ruled that a juror was unconstitutionally excluded, id. at 948-54.  The Supreme Court then reversed us on the juror exclusion issue.  Uttecht, 127 S. Ct. at 2222.  We therefore affirm the district court's rulings that the Washington death penalty statute is facially valid[.]").

[67]  See infra note 43.

ORDER GRANTING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PETITIONER'S
CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DENYING AMENDED HABEAS PETITION            -59-

1    Wn.2d at 636.[68]  Gentry has not shown that this decision was contrary to, or an unreasonable

2    application of, clearly established federal law.

3        First, the evidentiary basis for the admission of the unredacted judgment and sentence is a

4    matter of state law, which cannot be reviewed by the Court in this federal habeas proceeding.

5    See Romano v. Oklahoma, 512 U.S. 1, 7 (1994) ("'[T]he states enjoy their traditional latitude to

6    prescribe the method by which those who commit murder shall be punished.'  Blystone v.

7    Pennsylvania, 494 U.S. 299, 309 (1990).  This latitude extends to evidentiary rules at sentencing

8    proceedings."); Estelle, 502 U.S. at 67-68.  "The Eighth Amendment does not establish a federal

9    code of evidence to supercede state evidentiary rules in capital sentencing proceedings."

10   Romano, 512 U.S. at 12.

11       Second, it appears, based on the express wording from paragraphs sixteen and seventeen

12   of the Amended Petition, that the essence of Gentry's claim is that his constitutional rights were

13   violated by admission of the unredacted judgment and sentence because he was somehow not

14   allowed to "deny or explain" the evidence.  It is clear following Gardner v. Florida, 430 U.S.

15   349 (1977), that the Due Process Clause applies to the sentencing process.  See id. at 358 ("[I]t

16   is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements

17   of the Due Process Clause.") (plurality opinion).  The "deny or explain" language from Gentry's

18   Amended Petition is also from Gardner.  In Gardner, after finding the defendant guilty, the jury

19   recommended to the trial court that he not be sentenced to death.  430 U.S. at 352-53.  After

20

21
_____

22       [68]  The fact that the Washington Supreme Court did not cite to federal law or United States
     Supreme Court precedent in rendering this decision is of no consequence.  See Packer, 537 U.S. at 8 ("A
23   state-court decision is 'contrary to' our clearly established precedents if it 'applies a rule that contradicts
     the governing law set forth in our cases' or if it 'confronts a set of facts that are materially
24   indistinguishable from a decision of this Court and nevertheless arrives at a result different from our
     precedent.'  Avoiding these pitfalls does not require citation of our cases—indeed, it does not even
25   require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision
     contradicts them.") (emphasis in original) (internal citation to Williams, 529 U.S. at 405-06, omitted).
26

27   ORDER GRANTING RESPONDENT'S MOTION FOR
     SUMMARY JUDGMENT, DENYING PETITIONER'S
     CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28   DENYING AMENDED HABEAS PETITION          -60-

receiving a presentence investigation report, part of which was not disclosed to the defense, the

trial court disregarded the jury's recommendation and imposed a death sentence.  Id.  On appeal,

the Supreme Court concluded "that petitioner was denied due process of law when the death

sentence was imposed, at least in part, on the basis of information which he had no opportunity

to deny or explain."  Id. at 362; see also Skipper v. South Carolina, 476 U.S. 1, 5 n.1 (1986)

("[I]t is also the elemental due process requirement that a defendant not be sentenced to death

'on the basis of information which he had no opportunity to deny or explain.'") (quoting

Gardner).

        The Gardner decision and its progeny are not favorable to Gentry, however, because he

cannot show that he was sentenced to death, even in part, on the basis of information that he had

no opportunity to explain or deny.  What is clear from the record is that Gentry had ample

opportunity to rebut or explain the information in the rape judgment and sentence.  As

previously discussed, Gentry's counsel successfully moved to redact page eight from the

judgment and sentence.  See infra note 47.  More importantly, Gentry decided not to offer any

evidence about the first degree rape conviction for fear of "opening the door" about the facts of

the case.[69]  This decision was reasonable, especially since the victim was present in the

---

        [69]  See, e.g., 19 REC 10274:16-10275:12 ("We will not be offering any evidence as to the Kitsap
County conviction for First Degree Rape[.] . . .  I don't know what the state plans, but I brought the
motion to say, our position is that if we don't question our witnesses about either the Kitsap County
conviction or the facts of this case, then it is inappropriate to question them on the facts as alleged in this
case and in the Kitsap County Rape conviction. . . .  But by opening the door on one or more of the
Florida convictions, we don't open the door on the Kitsap County Rape conviction or about putting on
testimony about what happened in this case."); id. at 10276:2-6 ("Obviously, if the testimony does not go
the way we think it will, then—for instance, if one of our witnesses say [sic] something about the Kitsap
County Rape conviction, the door is opened, and we understand that."); id. at 10277:14-18 ("But if we
talk about things in Mr. Gentry's childhood, it is our position that that clearly does not open the door to
the facts about the Rape conviction in Kitsap County.").

courtroom during the penalty phase and available as a rebuttal witness.[70]  Just because Gentry

decided not to "deny or explain" the rape conviction does not mean that he did not have an

opportunity to do so.[71]  Therefore, the Court denies the claim regarding the admission of the

judgment and sentence as set forth in paragraphs sixteen and seventeen of the Amended Petition.

---

[70]  In the PRP proceeding, the State submitted a declaration from DPA Brian Moran stating that the "victim of the rape, C.H., was present in the courtroom during the penalty phase[; and] [h]ad the defense 'opened the door' to the rape conviction, we were prepared to put her on to testify to the facts of the rape," which included that "the victim became pregnant by Gentry as a result of the rape and as established by DNA testing, [and that] Gentry had threatened her repeatedly with a knife during the rape and left a puncture mark on her chest area [; and] C.H. was 17 years old at the time[.]"  38 REC 20349-20350; see also 19 REC 10281:4-8 ("Because, Your Honor, what I don't want to get in to [sic] is us putting the witness up there, giving us completely factual recitation, and then the Court saying, well, you've opened the door, so now we'll call the victim in the Kitsap County Rape[.]").

[71]  During oral argument, Gentry's counsel indicated that the basis for this claim was Gentry's purported inability to cross-examine Judge Hanley during the penalty phase about the basis for the extraordinary twenty-year sentence for Gentry's prior rape conviction.  See Dkt. #47 at ¶314 ("As Judge Hanley was the trial judge, Mr. Gentry's lawyers could not cross-examine him as a witness about the validity of the reasons for finding that there were substantial and compelling reasons to impose an exceptionally high sentence upon Mr. Gentry or attempt to rebut such evidence."); Dkt. #275 at 11 ("Mr. Gentry had no opportunity to cross-examine Judge Hanley about the prior judgment.").  Even if this is the basis for the claim, Gentry has not shown that clearly established federal law under the Confrontation or Due Process clauses, or otherwise, gave Gentry the right to cross-examine Judge Hanley during the penalty phase.  See, e.g., John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L. Rev. 1967, 1980 (2005) ("The [Supreme] Court has never said that the right to 'deny or explain' sentencing information includes the confrontation rights that Williams [v. New York, 337 U.S. 241 (1949)] rejected: the right to see, hear, and cross-examine the sources of that information. . . .  Instead, in a string of noncapital cases reaching well into the 1990s, the Court has continued to cite Williams favorably for the broad proposition that there are no constitutional limits on the sources of information that a court may consider in the process of sentencing.  Today, federal appellate courts continue to cite Williams for the proposition that the Confrontation Clause does not apply at sentencing, whether capital or otherwise."); United States v. Higgs, 353 F.3d 281, 324 (4th Cir. 2003) ("It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding."), cert. denied, 543 U.S. 999 (2004).  Furthermore, given that Gentry decided not to present evidence regarding the underlying facts of the prior rape conviction, it is inconceivable that he would have wanted to put the basis for the extraordinary sentence at issue.

1

 **5.     Motion for reconsideration**

2      At oral argument, Gentry's counsel requested leave to file "merits briefing" on all

3 pending claims and the issue of cumulative error.  Based on the rulings set forth in this order, the

4 Court finds that further briefing is not necessary or required.  With respect to the claims

5 discussed in Section II.D.4 and the issue of cumulative error discussed in Section II.D.3 above,

6 however, the Court grants Gentry leave to file a motion for reconsideration supporting his

7 contention that merits briefing is needed on these issues.  In considering this motion, the Court

8 will not apply the usual standard for motions for reconsideration as set forth in Local Civil Rule

9 7(h), including the time limitation.  Instead, Gentry shall file the motion, not to exceed 20 pages,

10 by **Friday, October 3, 2008**.  Respondent shall not file a response to the motion unless

11 requested by the Court.

12

 **III.  CONCLUSION**

13      For all the foregoing reasons, the Court GRANTS "Respondent's Motion for Summary

14 Judgment" (Dkt. #272) and DENIES petitioner's "Cross Motion for Summary Judgment" (Dkt.

15 #275).  The Court also DISMISSES Gentry's "First Amended Petition for a Writ of Habeas

16 Corpus Pursuant to 28 U.S.C. § 2254" (Dkt. #47).  Gentry is GRANTED LEAVE to file a

17 motion for reconsideration consistent with the ruling set forth in Section II.D.5 above.

18

19      DATED this 15th day of September, 2008.

20

21

22      _MN S Lasnik_

       Robert S. Lasnik
23      United States District Judge

24

25

26

27 ORDER GRANTING RESPONDENT'S MOTION FOR
   SUMMARY JUDGMENT, DENYING PETITIONER'S
   CROSS-MOTION FOR SUMMARY JUDGMENT, AND
28 DENYING AMENDED HABEAS PETITION          -63-